**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HARTFORD COMPUTER HARDWARE, INC., *et al.*,[1] | ) | Case No. 11-49744 (PSH) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Hon. Pamela S. Hollis |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. § 364, (II) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED LENDER PURSUANT TO 11 U.S.C. §§ 361 AND 363, AND (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

Upon the motion of Hartford Computer Group, Inc., Nexicore Services, LLC, Hartford Computer Hardware, Inc., and Hartford Computer Government, Inc., the debtors and debtors in possession (the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), dated December 12, 2011 (the "Motion") [Docket No. 13], (a) seeking the entry of an interim order and a final order (the "Final Order"): (i) authorizing the Debtors to enter into a senior secured post-petition loan agreement (the "DIP Facility"), pursuant to section 364 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), with Delaware Street Capital Master Fund, L.P. ("Delaware Street" or the "DIP Lender"), in substantially the form attached hereto as Exhibit A (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "DIP Credit Agreement"),[2] pursuant to the terms of this Final Order, the DIP Credit Agreement, and any related documents required to be delivered by or in connection with the DIP Credit Agreement, including, without limitation,

---

[1] The Debtors are Hartford Computer Hardware, Inc. (FEIN 27-4297525), Nexicore Services, LLC (FEIN 03-0489686), Hartford Computer Group, Inc. (FEIN 36-2973523), and Hartford Computer Government, Inc (FEIN 20-0845960).

[2] The DIP Credit Agreement attached to this Final Order as Exhibit A shall be deemed to be the effective DIP Credit Agreement *nunc pro tunc* to the entry of the Interim Order on December 15, 2012 [Dkt. No. 66].

2069684.5

any security agreements, pledge agreements, UCC financing statements, and other collateral documents (collectively with the DIP Credit Agreement, the "DIP Credit Documents") and to perform such other and further acts as may be required in connection with the DIP Credit Documents; (ii) granting security interests, liens, and superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and priming liens pursuant to section 364(d) of the Bankruptcy Code) to the DIP Lender to secure all obligations of the Debtors under and with respect to the DIP Facility; (iii) authorizing Debtors' use of the Cash Collateral (as hereinafter defined) solely on the terms and conditions set forth in this Final Order and in the DIP Credit Agreement; (iv) granting adequate protection to Delaware Street in its capacity as the Prepetition Secured Lender (as hereinafter defined); and (v) modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the Debtors, the DIP Lender, and the Prepetition Secured Lender to implement the terms of this Final Order; (b) requesting, pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), that an emergency interim hearing on the Motion be held for the Court to consider entry of an interim order; and (c) requesting, pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), that the Court (i) schedule a final hearing (the "Final Hearing") on the Motion within thirty (30) days of the Petition Date (as hereinafter defined) to consider entry of the Final Order, and (ii) approve certain notice procedures with respect thereto; and the Final Hearing having been held by this Court on January 26, 2012; and the Court having considered the Motion and all pleadings related thereto, including the record made by the Debtors at the Final Hearing; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**THE COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:**

A.      On December 12, 2011 (the "Petition Date"), the Debtors filed with this Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors are

continuing to operate their businesses and are managing their respective properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner. An official committee of unsecured creditors (the "Committee") has been appointed in these Chapter 11 Cases.

B.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      The Debtors have provided notice of the Motion and the Final Hearing by facsimile, electronic mail, or overnight mail to: (i) the Office of the United States Trustee (the "U.S. Trustee"); (ii) the thirty (30) largest unsecured creditors of the Debtors; (iii) counsel to the DIP Lender; (iv) counsel to the Prepetition Secured Lender; (v) all known parties with liens of record on assets of the Debtors as of the Petition Date; (vi) all financial institutions at which the Debtors maintain deposit accounts; (vii) the landlords for all non-residential real properties occupied by the Debtors as of the Petition Date; (viii) the Internal Revenue Service; and (ix) all other parties requesting notice pursuant to Bankruptcy Rule 2002. The Court concludes that the foregoing notice was sufficient and adequate under the circumstances and complies with Bankruptcy Rule 4001 in all respects.

D.      Without prejudice to the rights of any other party, but subject to the limitations thereon set forth in paragraph 29 below, the Debtors admit, stipulate and agree that:

(1)      Pursuant to that certain Loan and Security Agreement dated as of December 17, 2004 (as amended, supplemented or otherwise modified prior to the date hereof, the "Prepetition Credit Agreement"), by and among, on the one hand, Hartford Computer Group, Inc., and Nexicore Services, LLC, as the borrowers, and by Hartford Computer Hardware, Inc., and Hartford Computer Government, Inc., as the guarantors, and, on the other hand, Delaware Street as the lender (the "Prepetition Secured Lender"), the Prepetition Secured Lender made certain loans

3

and other financial accommodations to or for the benefit of the Debtors. In connection with the Prepetition Credit Agreement, the Debtors entered into certain collateral and ancillary documentation with the Prepetition Secured Lender (such collateral and ancillary documentation collectively with the Prepetition Credit Agreement, the "Prepetition Credit Documents"). All obligations of the Debtors arising under the Prepetition Credit Documents, including all loans, advances, debts, liabilities, principal, interest, fees, swap exposure, charges, expenses, indemnities, and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts owing to the Prepetition Secured Lender by the Debtors, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, shall hereinafter be referred to as the "Prepetition Obligations."

(2)    As of December 1, 2011, the Debtors were truly and justly indebted to the Prepetition Secured Lender pursuant to the Prepetition Credit Documents, without defense, counterclaim or offset of any kind, in the following aggregate amounts in respect of loans and other financial accommodations made by the Prepetition Secured Lender pursuant to and in accordance with the terms of the Prepetition Credit Documents, not including (i) interest accruing after December 1, 2011 and (ii) fees: (a) Revolver Loan:  $9,076,302 (the "Prepetition Revolving Debt"); (b) Term Loan A:  $27,482,409; Term Loan B:  $12,660,490; Term Loan C:  $5,748,432; Term Loan D: $6,965,575; Term Loan E:  $8,640,407 (Term Loan A, B, C, D, and E, collectively, the "Prepetition Term Debt").

(3)    In addition as of the Petition Date, the Debtors were further truly and justly indebted to the Prepetition Secured Lender pursuant to the Prepetition Credit Documents, without defense or setoff of any kind, in the aggregate amounts of (i) all other accrued or hereafter accruing and unpaid interest on the Prepetition Revolving Debt and the Prepetition Term Debt, (ii) all unpaid fees and expenses (including the fees and expenses of attorneys and financial advisors for the Prepetition Secured Lender) now or hereafter due under the Prepetition Credit Documents, and

4

(iii) any other obligations of the Debtors under the Prepetition Credit Documents.

(4)    Pursuant to the Prepetition Credit Documents, the Prepetition Obligations are secured by valid, duly perfected first priority security interests in and continuing liens on substantially all of the assets and property of the Debtors, including, but not limited to, all personal and fixture property of every kind and nature, including without limitation, all goods (including inventory, equipment, and any accessions thereto), instruments, documents, accounts receivable, chattel paper (including electronic chattel paper), the Debtors' lockbox and cash concentration account, letter of credit rights, commercial tort claims, securities and all other investment property, insurance claims and proceeds, intellectual property, and all general intangibles, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing, in each case wherever located, whether then owned or existing or thereafter acquired or arising. All collateral granted or pledged by the Debtors to the Prepetition Secured Lender pursuant to the Prepetition Credit Documents shall collectively be referred to herein as the "Prepetition Collateral."

(5)    Substantially all of the Debtors' cash, including, without limitation, all cash and other amounts on deposit or maintained in the Debtors' lockbox and cash concentration account by the Debtors and any amounts generated by collection of the Debtors' accounts receivable, the sale of the Debtors' inventory, or any other disposition of the Prepetition Collateral constitutes proceeds of the Prepetition Collateral and therefore constitutes cash collateral of the Prepetition Secured Lender within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

(6)    All Prepetition Credit Documents executed and delivered by the Debtors to the Prepetition Secured Lender are valid and enforceable by the Prepetition Secured Lender against the Debtors. The Prepetition Secured Lender duly perfected its liens upon and security interests in the Prepetition Collateral in accordance with applicable law. The liens and security interests of the Prepetition Secured Lender in the Prepetition Collateral, as security for the

5

2069684.5

Prepetition Obligations, constitute valid, binding, enforceable and perfected first priority liens and security interests and are not subject to avoidance, disallowance, subordination or re-characterization pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except insofar as such liens are subordinated to the DIP Liens, and the Carve-Out (as each term is hereinafter defined) in accordance with this Final Order).

(7)    The Prepetition Obligations constitute legal, valid and binding obligations of the Debtors, no offsets, defenses or counterclaims to the Prepetition Obligations exist, and no portion of the Prepetition Obligations is subject to avoidance, disallowance, reduction, subordination or re-characterization pursuant to the Bankruptcy Code or applicable non-bankruptcy law.  The Debtors have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code) or causes of action against the Prepetition Secured Lender with respect to the Prepetition Credit Documents or otherwise, whether arising at law or at equity, including, without limitation, any re-characterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553, inclusive, of the Bankruptcy Code.  The Debtors irrevocably waive any right to (i) challenge or contest the liens or security interests of the Prepetition Secured Lender in the Prepetition Collateral, (ii) challenge or contest the validity of the Prepetition Obligations, or (iii) assert any claims or causes of action against the Prepetition Secured Lender or any of its affiliates, agents, attorneys, financial advisors, officers, managers, directors or employees under the Bankruptcy Code or applicable non-bankruptcy law.

E.    The Debtors have an immediate and critical need to obtain post-petition financing under the DIP Facility in order to operate their businesses as Debtors in Possession and comply with their obligations as Debtors in Possession.

F.    The Debtors also have an immediate and critical need to use Cash Collateral pursuant to the terms of this Final Order to, among other things, finance the ordinary costs of their operations, maintain business relationships with vendors, suppliers and customers, make payroll, and

6

satisfy other working capital and operational needs. The Debtors' access to sufficient working capital and liquidity through the use of Cash Collateral pursuant this Final Order is vital to the preservation and maintenance of the going concern value of the Debtors' estates. Consequently, without the continued use of Cash Collateral by the Debtors, to the extent authorized pursuant to this Final Order, the Debtors and their estates would suffer immediate and irreparable harm.

G.    The Debtors are unable to obtain (i) adequate unsecured credit allowable either under (a) sections 364(b) and 503(b)(1) of the Bankruptcy Code or (b) section 364(c)(1) of the Bankruptcy Code, (ii) adequate credit secured either by (x) a senior lien on unencumbered assets of their estates under section 364(c)(2) of the Bankruptcy Code or (y) a junior lien on encumbered assets of their estates under section 364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(1) of the Bankruptcy Code from sources other than the DIP Lender on terms more favorable than the terms of the DIP Facility. The only funding available to the Debtors is the DIP Facility.

H.    The DIP Lender has indicated a willingness to provide the Debtors with certain financing commitments but solely on the terms and conditions set forth in this Final Order and the DIP Credit Documents. After considering all of their alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the financing to be provided by the DIP Lender pursuant to the terms of this Final Order and the DIP Credit Documents represents the best post-petition financing presently available to the Debtors.

I.    The Prepetition Secured Lender is prepared to consent to: (i) the imposition of certain liens under section 364(d)(1) of the Bankruptcy Code in favor of the DIP Lender, but solely on the terms and conditions set forth in this Final Order and in the DIP Credit Documents, which liens will prime the Primed Liens (as hereinafter defined), and (ii) the Debtors' use of the Prepetition Collateral (including the Cash Collateral), _provided_ that the Court authorizes the Debtors, pursuant to sections 361, 363 and 364 of the Bankruptcy Code, to grant to the

7

Prepetition Secured Lender, as adequate protection for the Adequate Protection Obligations (as hereinafter defined), but subject to the Carve-Out (a) replacement security interests in and liens and mortgages upon (collectively, the "Adequate Protection Liens") all of the DIP Collateral (as hereinafter defined, but excluding all Avoidance Actions (as hereinafter defined)) and the proceeds thereof, and (b) a superpriority administrative expense claim under section 507(b) of the Bankruptcy Code (the "Adequate Protection Priority Claim"), which Adequate Protection Priority Claim shall be subordinate in priority only to the Carve-Out, and the superpriority claim under section 364(c)(1) of the Bankruptcy Code in favor of the DIP Lender, but which shall not be legally payable from the proceeds of Avoidance Actions. The Adequate Protection Liens and the Adequate Protection Priority Claim shall secure the payment of the Prepetition Obligations in an amount equal to any diminution in the value of the Prepetition Secured Lender's interests in the Prepetition Collateral, including the Cash Collateral, from and after the Petition Date (the aggregate amount of such diminution, the "Adequate Protection Obligations") including, without limitation, any diminution resulting from: (i) the Debtors' use of the Prepetition Collateral, (ii) the imposition of the DIP Liens, which will prime the Primed Liens, and (iii) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code or any comparable provision under Canadian Law; provided, however, that notwithstanding the foregoing, the diminution claim secured by the Adequate Protection Liens and the Adequate Protection Priority Claim shall not include the diminution in the Prepetition Collateral arising from, and to the extent of, the deemed repayments of the Prepetition Obligations under paragraph 6 of this Final Order. The Adequate Protection Liens shall be junior to the Carve-Out, the DIP Liens, and the Permitted Liens (as hereinafter defined) with respect to the collateral encumbered by any Permitted Liens to the extent such Permitted Liens are senior to the liens securing the Prepetition Obligations.

J.     The consent of the Prepetition Secured Lender to the priming of its liens by the DIP Liens is limited to the DIP Facility presently before the Court, with Delaware Street as

8

the DIP Lender, and shall not extend to any other post-petition financing or to any modified version of such DIP Facility.  Furthermore, the consent of the Prepetition Secured Lender to the priming of its liens by the DIP Liens does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Prepetition Secured Lender that its interests in the Prepetition Collateral are adequately protected pursuant to this Final Order or otherwise.  The Prepetition Secured Lender does not consent to the Debtors' use of the Prepetition Collateral, including the Debtors' use of the Cash Collateral, except on the terms of this Final Order.

K.     The security interests and liens granted pursuant to this Final Order to the DIP Lender are appropriate under section 364(d) of the Bankruptcy Code because, among other things: (i) such security interests and liens do not impair the interests of any holder of a valid, perfected, and non-avoidable prepetition security interest in or lien upon the property of the Debtors' estates, or (ii) the holders of such valid, perfected, prepetition security interests and liens have consented to the security interests and priming liens granted pursuant to this Final Order to the DIP Lender.

L.     Good cause has been shown for immediate entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2).  In particular, the authorization granted herein for Debtors to continue using Cash Collateral and for the Debtors to execute the DIP Credit Documents and obtain financing, including on a priming lien basis, is necessary to avoid immediate and irreparable harm to the Debtors and their estates.  Entry of this Final Order is in the best interest of the Debtors, their estates and creditors.  The terms of the DIP Credit Documents and the terms of the Debtors' continued use of Cash Collateral pursuant to this Final Order are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

9

M.    The Debtors, the DIP Lender, and the Prepetition Secured Lender have negotiated the terms and conditions of the DIP Credit Documents and this Final Order (including the Debtors' use of Cash Collateral pursuant hereto) in good faith and at arm's-length, and any credit extended and loans made to the Debtors pursuant to this Final Order and the DIP Credit Documents shall be, and hereby are, deemed to have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

N.    Based on the foregoing, and upon the record made before this Court at the Final Hearing, and good and sufficient cause appearing therefore,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    The Motion is approved on the terms and conditions set forth in this Final Order.  Any objections to the Motion that have not previously been withdrawn or resolved are hereby overruled on the merits.  This Final Order shall become effective and binding upon all parties in interest immediately upon its entry.  To the extent the terms of the DIP Credit Documents or the interim order entered on December 15, 2011 [Dkt. #66] (the "Interim Order") differ in any material respect from the terms of this Final Order, this Final Order shall control.

2.    The Debtors are hereby authorized to execute the DIP Credit Documents, including the DIP Credit Agreement and such additional documents, instruments, and agreements as may be reasonably required by the DIP Lender to implement the terms or effectuate the purposes of this Final Order.

3.    The Debtors are hereby authorized to use the Cash Collateral and to incur DIP Obligations (as hereinafter defined) solely in accordance with the Budget (as hereinafter defined) and the other terms and conditions set forth in the DIP Credit Agreement and in this Final Order.

4.    The Debtors are hereby authorized and directed to pay on demand all fees,

expenses and other amounts payable under the terms of the DIP Credit Agreement and all out-of-pocket costs and expenses of the DIP Lender in accordance with the terms of the DIP Credit Agreement (including, without limitation, the reasonable fees and disbursements of legal counsel and financial advisors retained by the DIP Lender (including the professional fees incurred by the DIP Lender in connection with the preparation or enforcement of the DIP Credit Agreement and the other DIP Credit Documents)).  None of such costs, fees, and expenses shall be subject to Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court; provided, however, that the DIP Lender shall circulate an invoice for any such fees and expenses to counsel for the Committee and counsel for the US Trustee at least ten business days prior to payment, and no such payment shall be made without further order of the Court in the event either the Committee or the US Trustee object to such payment.  In addition, the Debtors are hereby authorized and directed to indemnify the DIP Lender against any liability arising in connection with the DIP Credit Documents to the extent set forth in the DIP Credit Documents.  All unpaid fees, expenses and indemnity rights of the DIP Lender shall constitute DIP Obligations (as hereinafter defined) and shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations.

5.     The DIP Credit Documents shall constitute valid and binding obligations of the Debtors and shall be enforceable against the Debtors in accordance with the terms thereof.  No obligation, payment, transfer or grant of security under the DIP Credit Documents or this Final Order shall be stayed, restrained, voided, voidable, or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

6.     Upon entry of this Final Order, the Debtors shall be deemed to have (a) remitted to the Prepetition Secured Lender for application to and repayment of the Prepetition

2069684.5

Revolving Debt, all Cash Collateral in their possession or control on the Petition Date or
coming into their possession and control after the Petition Date and arising from, or
constituting proceeds of, the Prepetition Collateral, including, but not limited to, all funds
contained in all of their deposit accounts on the Petition Date, and (b) reborrowed a like
amount as a DIP Obligation under the DIP Facility.  The automatic stay provisions of section
362 of the Bankruptcy Code are hereby modified to the extent necessary to permit the foregoing
remission and application of Cash Collateral and proceeds of Prepetition Collateral by the Debtors
and the Prepetition Secured Lender.  Any and all payments and proceeds remitted, or deemed
remitted, to the Prepetition Secured Lender pursuant to this paragraph shall be received by the
Prepetition Secured Lender free and clear of any claim, charge, assessment or other liability
including, without limitation, any such claim or charge arising out of or based on sections
506(c) or 552(b) of the Bankruptcy Code, whether directly or indirectly, all of which are
hereby waived by the Debtor.  For purposes of this Final Order, "proceeds" of any collateral
shall mean proceeds (as defined in the Illinois Uniform Commercial Code) of such collateral
as well as: (x) any and all proceeds of any insurance, indemnity, warranty or guaranty payable
to or for the account of the Debtors from time to time with respect to such collateral; and (y)
all other payments, dividends, interest or other distributions on or in respect of any such
Prepetition Collateral.

   7. All draws made on the DIP Facility (or deemed made pursuant to
paragraph 6 hereof), all interest thereon, all contingent reimbursement obligations of the
Debtors with respect to the undrawn amounts under the DIP Facility, and all fees, costs,
expenses, indemnification obligations and other liabilities owing by the Debtors to the DIP
Lender or any other parties under the DIP Credit Documents and this Final Order shall
hereinafter be referred to as the "DIP Obligations." The DIP Obligations shall: (a) be
evidenced by the books and records of the DIP Lender; (b) bear interest and be subject to fees

12

payable at the rates and in the amounts set forth in the DIP Credit Agreement; (c) be secured in the manner set forth in paragraphs 13 and 14 below; (d) be payable in accordance with the terms of the DIP Credit Documents; and (e) comply with and otherwise be governed by the terms of this Final Order and the terms of the DIP Credit Documents.

        8.     Subject to the terms and conditions set forth in this Final Order and in the DIP Credit Documents (including the Budget), the Debtors may use the Cash Collateral to: (a) pay interest, fees and expenses associated with the DIP Facility, as provided in the DIP Credit Documents, (b) make any adequate protection payments required under this Final Order, and (c) fund its general corporate and working capital requirements (including, without limitation, certain administrative expenses in the Chapter 11 Cases), in each case in accordance with the Budget and the terms of this Final Order.

        9.     Attached hereto as <u>Exhibit B</u> is a budget (the "<u>Budget</u>") for the period commencing on the Petition Date and ending on May 2012.  The Budget reflects on a line-item basis the Debtors' anticipated cumulative cash receipts and expenditures on a monthly basis and all necessary and required cumulative expenses which the Debtors expect to incur during each month of the Budget.  Subject to the variances permitted under § 14.1 of the DIP Credit Agreement, the Debtors shall not make any payments or other disbursements other than as set forth in the Budget, without the prior written consent of the DIP Lender and the Prepetition Secured Lender.  Failure by the Debtors to comply with the Budget variance provisions set forth in this paragraph 9 and in § 14.1 of the DIP Credit Agreement shall constitute an Event of Default under the DIP Credit Agreement and this Final Order.  The Budget shall not be modified without the prior written consent of the DIP Lender and the Prepetition Secured Lender.  The Debtors shall comply with all reporting requirements set forth in the DIP Credit Documents and shall provide the Prepetition Secured Lender with such additional financial reports as the Prepetition Secured Lender may reasonably request from time to time.

2069684.5

10.    On the earliest to occur (the "DIP Credit Agreement Termination Event") of: (a) May 18, 2012; (b) the occurrence of the effective date under any plan of reorganization or liquidation for the Debtors; (c) the completion of the sale or any other disposition by the Debtors of all or any material portion of the Debtors' assets; and (d) the occurrence and continuation of an Event of Default under this Final Order or the DIP Credit Agreement, the Debtors shall be required to repay the DIP Lender in full and in cash all outstanding DIP Obligations.

11.    The Debtors' authority to use Cash Collateral in accordance with this Final Order and the Budget shall terminate on the earliest to occur (the "Cash Collateral Termination Event") of: (a) May 18, 2012; (b) the occurrence of the effective date under any plan of reorganization or liquidation for the Debtors; (c) the completion of the sale or any other disposition by the Debtors of all or any material portion of the Debtors' assets; and (d) the occurrence and continuation of an Event of Default under this Final Order or the DIP Credit Agreement and a determination by the Prepetition Secured Lender, by written notice delivered by hand-delivery, overnight mail, facsimile, and  email to counsel for the Debtors, the Committee, and the U.S. Trustee, to terminate the Debtors' use of Cash Collateral pursuant to the terms of this Final Order.

12.    The occurrence of any of the events set forth in clauses (a) through (q) below shall constitute an immediate Event of Default under this Final Order and the DIP Credit Agreement: (a) failure by the Debtors to make any payment to the DIP Lender or the Prepetition Secured Lender within five (5) business days after such payment becomes due; (b) failure by the Debtors to comply with any provision of this Final Order or the DIP Credit Agreement including, without limitation, the Budget variance provisions set forth in § 14.1 of the DIP Credit Agreement and paragraph 9 hereof, and any other affirmative or negative covenants set forth in this Final Order or the DIP Credit Documents, or any other "Event of Default" shall have occurred and be continuing under and as defined in the DIP Credit Documents; (c) the Debtors shall take any

14

material action in the Chapter 11 Cases that is adverse to the Prepetition Secured Lender or its

interests in the Prepetition Collateral; (d) failure by the Debtors to file a motion, in form and

substance reasonably satisfactory to the DIP Lender and the Prepetition Secured Lender, for

approval of bidding and sale procedures for the sale of all or substantially all of the Debtors'

assets (the "Bid Procedures Motion") with the Court by December 14, 2011; (e) failure by the

Debtors to obtain an order of this Court, in form and substance satisfactory to the DIP Lender

and the Prepetition Secured Lender, approving the Bid Procedures Motion by January 26,

2012; (f) failure by the Debtors to obtain an order of this Court, in form and substance

acceptable to the DIP Lender and the Prepetition Secured Lender, approving the sale of all or

substantially all of the Debtors' assets by March 1, 2012; (g) failure by the Debtors to

consummate the sale or other disposition of all or substantially all of the Debtors' assets on or

before April 3, 2012; (h) any of the Chapter 11 Cases are dismissed or converted to a chapter

7 case, or a chapter 11 trustee, a responsible officer, or an examiner with enlarged powers

relating to the operation of the Debtors' business is appointed in any of the Chapter 11 Cases;

(i) this Court enters an order granting relief from the automatic stay to the holder or holders of

any security interest with a value in excess of $50,000 to permit an exercise of remedies with

respect to any of the Debtors' assets; (j) an order is entered reversing, amending,

supplementing, staying, vacating or otherwise modifying this Final Order without the consent

of the Prepetition Secured Lender and the DIP Lender; (k) the Debtors create, incur or suffer

to exist any post-petition liens or security interests other than: (A) those granted pursuant to

this Final Order, and (B) any other junior liens or security interests that the Debtors are

permitted to incur under the Prepetition Credit Agreement or under the DIP Credit Documents; (l)

the filing by the Debtors of any motion, application or adversary proceeding challenging the

validity, enforceability, perfection or priority of the liens securing the Prepetition Obligations or

asserting any claim or cause of action against and/or with respect to the Prepetition Obligations, the

15

2069684.5

liens securing the Prepetition Obligations, or the Prepetition Secured Lender or any of its affiliates, agents, attorneys, financial advisors, officers, managers, directors or employees (or if the Debtors support any such motion, application or adversary proceeding commenced by any third party); (m) this Court enters an order terminating the Debtors' exclusive period to file a plan of reorganization; (n) the Debtors file, or support the filing of, any plan of reorganization or liquidation that is not acceptable to the DIP Lender and the Prepetition Secured Lender in respect of the treatment of the Pre-Petition Obligations, the DIP Obligations, the Pre-Petition Collateral, the DIP Collateral, or the Adequate Protection Obligations; (o) Brian Mittman or an alternative acceptable to the DIP Lender and the Prepetition Secured Lender ceases to be the Chief Executive Officer of the Debtors (it being understood that it would be reasonable for the DIP Lender to find unacceptable any alternative not acceptable to Avnet, Inc. and Avnet International (Canada) Ltd. in their sole discretion); (p) any misrepresentation of a material fact made after the Petition Date by the Debtors or any of their agents to the Prepetition Secured Lender about (A) the financial condition of the Debtors, (B) the nature, extent, location or quality of any Prepetition Collateral, or (C) the disposition or use of any Prepetition Collateral, including the Cash Collateral; or (q) without the consent of the Prepetition Secured Lender and the DIP Lender, the Debtors file, or support the filing of, a motion seeking the authority for the Debtors to abandon any of the Prepetition Collateral pursuant to section 554 of the Bankruptcy Code or otherwise.

13.    As security for the full and timely payment of the DIP Obligations, the DIP Lender is hereby granted, pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, valid, enforceable, unavoidable, and fully perfected security interests in and liens and mortgages (collectively, the "DIP Liens") upon all prepetition and post-petition real and personal property of the Debtors (including, without limitation, all right, title and interest in all now owned and hereafter acquired accounts, chattel paper, deposit accounts, cash collateral, cash, money, cash equivalents, rights with respect to letters of credit, documents, equipment, motor vehicles, fixtures,

2069684.5

general intangibles, instruments, inventory, investment property, commercial tort claims, intellectual property, intercompany advances, leasehold interests and fee simple interests in real property and licenses and easements with respect to real property, and all products, accessions and proceeds with respect to any of the foregoing), whether now existing or hereafter acquired or arising and of any nature whatsoever, including, without limitation, (a) all Prepetition Collateral and (b) all assets of the Debtors that do not constitute Prepetition Collateral and the proceeds thereof ((a) and (b) collectively, the "DIP Collateral"), but not any avoidance actions of the Debtors' estates arising under chapter 5 of the Bankruptcy Code (the "Avoidance Actions").

14.     The DIP Liens shall be subject and subordinate to the Carve-Out and shall: (a) pursuant to section 364(c)(2) of the Bankruptcy Code, constitute first priority security interests in and liens upon all DIP Collateral that is not otherwise subject to any valid, perfected, enforceable and non-avoidable lien in existence as of the Petition Date; (b) pursuant to section 364(d)(1) of the Bankruptcy Code, be senior to and prime (i) those liens on the Prepetition Collateral in favor of the Prepetition Secured Lender with respect to the Prepetition Obligations, (ii) any and all valid, perfected, enforceable and non-avoidable liens on the Prepetition Collateral that are junior in priority to the liens of the Prepetition Secured Lender, and (iii) the Adequate Protection Liens ((i), (ii) and (iii) above, collectively, the "Primed Liens"); and (c) pursuant to section 364(c)(3) of the Bankruptcy Code, be immediately junior in priority to any and all valid, properly perfected, enforceable and non-avoidable liens other than the Primed Liens on assets of the Debtors in existence as of the Petition Date, but only to the extent such liens are senior in priority to the Primed Liens (collectively, the "Permitted Liens").

15.     The DIP Liens and the Adequate Protection Liens shall not be subject to challenge and shall attach and become valid, perfected, enforceable, non-avoidable and effective by operation of law as of the Petition Date without any further action by the Debtors, the DIP Lender or the Prepetition Secured Lender, and without the necessity of execution by the Debtors, or the

17

filing or recordation, of any financing statements, security agreements, vehicle lien applications, mortgages, fixture filings, filings with the U.S. Patent and Trademark Office, or other documents. All DIP Collateral shall be free and clear of other liens, claims and encumbrances, except the Primed Liens, the Permitted Liens, the Carve-Out, and other permitted liens and encumbrances as provided in the DIP Credit Documents. If the DIP Lender hereafter requests that the Debtors execute and deliver to the DIP Lender any financing statements, security agreements, collateral assignments, mortgages, fixture filings, or other instruments and documents considered by the DIP Lender to be reasonably necessary or desirable to further evidence the perfection of the DIP Liens, the Debtors are hereby authorized and directed to execute and deliver such financing statements, security agreements, mortgages, fixture filings, collateral assignments, instruments, and documents, and the DIP Lender is hereby authorized to file or record such documents in its discretion, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of entry of the Interim Order.

16.    In addition to the priming liens and security interests granted to the DIP Lender pursuant to this Final Order, pursuant to section 364(c)(1) of the Bankruptcy Code, all DIP Obligations shall constitute allowed superpriority administrative expense claims (the "Superpriority Claims") with priority, subject and subordinate to the Carve-Out, over any and all administrative expenses, diminution claims (including all Adequate Protection Obligations), and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726, or any other provisions of the Bankruptcy Code, which Superpriority Claims shall, subject to the Carve-Out, be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof, but excluding all Avoidance Actions and the proceeds thereof.

17.    Upon the occurrence and during the continuation of a Cash Collateral

Termination Event, to the extent unencumbered funds are not available to pay administrative expenses in full, the DIP Liens, the Superpriority Claims, and the Primed Liens shall be subject to the payment of the Carve-Out.  For purposes of this Final Order, the "Carve-Out" shall mean, collectively: (a) all statutory fees payable by the Debtors pursuant to 28 U.S.C. 1930(a)(6) and (b) the sum of (i) any unpaid professional fees and expenses specified in the Budget that were incurred but not paid as of the date of such Cash Collateral Termination Event (provided that such unpaid professional fees and expenses together with all previously paid professional fees and expenses shall not exceed the aggregate amount of professional fees and expenses set forth in the Budget for the period prior to such Cash Collateral Termination Event) of the professionals retained by the Debtors and the Committee that are subsequently allowed by order of this Court, in each case only to the extent not subsequently paid, and (ii) an amount equal to $300,000 for fees and expenses of the Debtors' professionals and the Committee professionals incurred after the Cash Collateral Termination Event, to be allocated between them subject to the Court's approval.  Notwithstanding any other provision of this Final Order or the DIP Credit Documents, all liens, claims and interests of the DIP Lender and the Prepetition Secured Lender shall be subject and subordinate to the Carve-Out.

18.    No portion of the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, or the Carve-Out, and no disbursements set forth in the Budget, shall be used for the payment of professional fees, disbursements, costs or expenses incurred in connection with asserting any claims or causes of action against the Prepetition Secured Lender or the DIP Lender, or any of their respective affiliates, agents, attorneys, financial advisors, officers, managers, directors or employees, including, without limitation, any action challenging or raising any defenses to the Prepetition Obligations or the DIP Obligations, the liens of the Prepetition Secured Lender or the DIP Lender, or the validity or enforceability of the DIP Credit Documents or the Prepetition Credit Documents; provided, however, that the Committee may use

19

funds allocated to its professionals in the Budget to investigate the pre-petition liens and claims of the Prepetition Secured Lender.

19.    As adequate protection for the payment of the Adequate Protection Obligations and subject to the Carve-Out, the Prepetition Secured Lender shall be granted the Adequate Protection Liens (as defined in paragraph I above) and the Adequate Protection Priority Claim (as defined in paragraph I above).  The Adequate Protection Liens shall be junior in priority to the Carve-Out, the DIP Liens, and the Permitted Liens with respect to the collateral encumbered by any such Permitted Liens to the extent such Permitted Liens were senior to the liens of the Prepetition Secured Lender securing the Prepetition Obligations as of the Petition Date, and senior to any other liens.  The Adequate Protection Priority Claim shall be junior in priority to the Carve-Out, and the Superpriority Claims and senior to all other administrative claims.  As additional adequate protection, (a) except for the DIP Facility and the DIP Liens granted to the DIP Lender pursuant to this Final Order, the Debtors shall be prohibited from incurring additional indebtedness having priority claims or liens equal to or senior in priority to the Prepetition Obligations or the liens securing such obligations, and (b) the Prepetition Secured Lender, the Committee, and the U.S. Trustee shall be entitled to receive all reporting due to the DIP Lender under the DIP Credit Agreement.  Without the prior written consent of the DIP Lender and the Prepetition Secured Lender, no portion of the DIP Collateral or the Prepetition Collateral (including any Cash Collateral) shall except as expressly permitted under the terms of the Budget, be used by the Debtors to satisfy chapter 11 administrative expenses.

20.    Nothing herein shall preclude the Prepetition Secured Lender from (i) seeking additional adequate protection from the Debtors at any time, (ii) seeking to terminate the Debtors' use of Cash Collateral, or (iii) seeking the payment of all interest accruing under the Prepetition Credit Agreement from and after the Petition Date.  Furthermore, nothing herein shall be construed as an acknowledgment or stipulation by the Prepetition Secured Lender that its interests

in the Prepetition Collateral are adequately protected.

21.    In consideration for (i) the Prepetition Secured Lender's consent to the Debtors' use of Cash Collateral in accordance with the Budget, and (ii) the Carve-Out, the Debtors shall irrevocably waive and shall not assert any surcharge claim against the DIP Lender or the Prepetition Secured Lender, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender or the Prepetition Secured Lender upon, the DIP Collateral or the Prepetition Collateral.    In no event shall the DIP Lender or the Prepetition Secured Lender be subject to the equitable doctrine of marshaling or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral.

22.    In consideration for the loans and other financial accommodations provided by the DIP Lender and the Prepetition Secured Lender pursuant to this Final Order, the Debtors irrevocably waive the right to (a) seek the authority to use the Cash Collateral without the consent of the Prepetition Secured Lender, (b) propose or support any plan of reorganization or liquidation that is not acceptable to the DIP Lender and the Prepetition Secured Lender in respect of the treatment of the Pre-Petition Obligations, the DIP Obligations, the Pre-Petition Collateral, the DIP Collateral, or the Adequate Protection Obligations, or (c) pursue the sale of any of the Prepetition Collateral pursuant to sections 363 or 365 of the Bankruptcy Code on terms that are not acceptable to the DIP Lender and the Prepetition Secured Lender.    The Debtors expressly acknowledge the Prepetition Secured Lender's right to credit bid the Prepetition Obligations in any sale of all or part of the Prepetition Collateral, whether pursuant to sections 363 or 365 of the Bankruptcy Code or any plan of reorganization or liquidation that may be proposed in the Chapter 11 Cases.

23.    None of the DIP Liens, the Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Priority Claims or the Carve-Out shall be (a) subject or subordinated

21

to, or made *pari passu* with, any lien that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code, or (b) subject or subordinated to, or made, *pari passu* with, any other lien or security interest, whether under sections 363 or 364 of the Bankruptcy Code or otherwise. The Adequate Protection Liens granted pursuant to this Final Order shall constitute valid, enforceable and duly perfected security interests and liens upon entry of this Final Order and the Prepetition Secured Lender shall not be required to file or serve financing statements, notices of lien or similar instruments which otherwise may be required under federal or state law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens. Failure by the Debtors to execute any documentation relating to the Adequate Protection Liens shall in no way affect the validity, enforceability, perfection or priority of such Adequate Protection Liens.

24.    The Prepetition Secured Lender shall be entitled to all of the rights and benefits arising under section 552(b) of the Bankruptcy Code, and the "equities of the case" exception shall have no application to the Prepetition Collateral.

25.    The provisions of this Final Order shall be binding upon and inure to the benefit of the DIP Lender, the Prepetition Secured Lender, the Debtors, and their respective successors and assigns. The provisions of this Final Order and any actions taken pursuant thereto (a) shall survive the entry of any order: (i) confirming any plan of reorganization in these Chapter 11 Cases; (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; or (iii) dismissing the Chapter 11 Cases; and (b) shall continue in full force and effect notwithstanding the entry of any such order, and the claims, liens, and security interests granted pursuant to this Final Order shall maintain their priority as provided by this Final Order until all of the DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full and discharged in accordance with the terms of the DIP Credit Agreement and this Final Order.

26.    If any or all of the provisions of this Final Order are hereafter reversed,

22

modified, vacated or stayed, such reversal, modification, vacatur or stay shall not affect (a) the validity of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt by the DIP Lender or the Prepetition Secured Lender, as applicable, of written notice of the effective date of such reversal, modification, vacatur or stay, or (b) the validity or enforceability of any claim, lien, security interest or priority authorized or created hereby or pursuant to the DIP Credit Documents with respect to any DIP Obligations or Adequate Protection Obligations. Notwithstanding any such reversal, modification, vacatur or stay, any use of Cash Collateral or the incurrence of DIP Obligations or Adequate Protection Obligations by the Debtors prior to the actual receipt by the DIP Lender of written notice of the effective date of such reversal, modification, vacatur or stay, shall be governed in all respects by the provisions of this Final Order, and the DIP Lender and the Prepetition Secured Lender shall be entitled to all of the rights, remedies, protections and benefits granted under section 364(e) of the Bankruptcy Code, this Final Order, and the DIP Credit Documents with respect to all uses of Cash Collateral and the incurrence of the DIP Obligations and Adequate Protection Obligations by the Debtors.

27.    The automatic stay provisions of section 362 of the Bankruptcy Code are hereby vacated and modified to the extent necessary to permit the DIP Lender or the Prepetition Secured Lender to exercise, upon the occurrence and during the continuation of any Event of Default (under the DIP Credit Agreement or this Final Order), all rights and remedies provided in the DIP Credit Documents and to take any or all of the following actions without further order of or application to this Court: (a) immediately terminate the Debtors' use of Cash Collateral; (b) immediately declare all DIP Obligations to be due and payable; (c) immediately terminate the lending commitments under the DIP Credit Agreement; and (d) take any other actions or exercise any other rights or remedies permitted under this Final Order, the DIP Credit Documents or applicable law to effect the repayment of the DIP Obligations; provided, however, that the DIP Lender or the Prepetition Secured Lender, as applicable, shall provide five (5) business days'

notice (by hand delivery or e-mail) to the Debtors, counsel for the Committee, and counsel to the

U.S. Trustee prior to exercising any lien enforcement rights or remedies with respect to the DIP

Collateral or the Prepetition Collateral.   The rights and remedies of the DIP Lender and the

Prepetition Secured Lender specified herein are cumulative and not exclusive of any rights or

remedies that the DIP Lender and the Prepetition Secured Lender may have under the DIP Credit

Documents, the Prepetition Credit Documents, or otherwise.   Upon entry of this Final Order, the

Debtors shall have no right to contest the enforcement of the remedies set forth in this Final Order

and the DIP Credit Documents on any basis other than an assertion that no Event of Default has

occurred, and, except with respect to such an assertion, the Debtors shall have no right to enjoin

any such enforcement under section 105 of the Bankruptcy Code or otherwise, or to seek any

injunctive relief inconsistent with the provisions of this Final Order or the DIP Credit

Documents.

      28.    The Debtors are hereby authorized, without further order of this Court: (a) to

enter into agreements with the DIP Lender providing for any non-material modifications to any DIP

Credit Document or the Budget, or for any other modifications to any DIP Credit Document

necessary to conform such DIP Credit Document to this Final Order; and (b) to enter into any

material modifications or amendments to any DIP Credit Document; provided, however, that the

Debtors shall promptly provide notice of any material modification or amendment of such DIP

Credit Document to counsel to the Committee  and counsel to the U.S. Trustee, each of which shall

have five (5) business days from the date of such notice within which to object in writing to such

modification or amendment.  If the Committee or the U.S. Trustee timely objects to any material

modification or amendment to the applicable DIP Credit Document, such modification or

amendment shall only be permitted pursuant to an order of this Court.

      29.    The stipulations and admissions contained in this Final Order, including,

without limitation, in recital paragraphs D(l) through D(7) of this Final Order, shall (a) be binding on

2069684.5

the Debtors under all circumstances and (b) be binding upon all other parties in interest unless, and solely to the extent that, (i) no later than ninety (90) days following the entry of this Final Order (unless extended by agreement of the Prepetition Secured Lender or by order of this Court for cause), a party in interest with requisite standing (with the Committee hereby deemed to have the requisite standing without the need for further application to this Court) has timely filed an adversary proceeding or contested matter in this Court (subject to the limitations set forth in paragraph 18 hereof) challenging the amount, validity, or enforceability of the Prepetition Obligations, or the perfection or priority of the Prepetition Secured Lender's liens on and security interests in the Prepetition Collateral, or otherwise asserting any Avoidance Actions or any other claims or causes of action on behalf of the Debtors' estates against the Prepetition Secured Lender or any of its affiliates, agents, attorneys, financial advisors, officers, managers, directors or employees under the Bankruptcy Code or non-bankruptcy law (any such adversary proceeding or contested matter, a "Challenge"), and (ii) the Court enters a final order in favor of the plaintiff in any such timely filed Challenge.  If no such Challenge is timely filed in respect of the Prepetition Obligations, (x) the Prepetition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination, re-characterization, defense or avoidance, for all purposes in the Chapter 11 Cases and any subsequent chapter 7 case, (y) the liens on the Prepetition Collateral securing the Prepetition Obligations shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, and perfected first priority liens not subject to defense, counterclaim, re-characterization, subordination or avoidance, and (z) the Prepetition Obligations and the liens on the Prepetition Collateral granted to secure the Prepetition Obligations shall not be subject to any other or further challenge by any party-in-interest, and all such parties-in-interest shall be enjoined from seeking to exercise the rights of the Debtors' estates, including without limitation, any successor thereto (including, without limitation, any estate representative or trustee appointed or elected for any of the Debtors' estates).  If any such Challenge is timely filed, the stipulations and admissions

25

contained herein shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on all parties-in-interest, except as to any such findings and admissions that were successfully challenged in such Challenge. Without limiting the generality of the foregoing, if the Stockholders (as defined in the Limited Objection to this Order filed at Dkt. No. 104) or any of them, elect to file a Challenge, they may file such Challenge in this Court within the time period provided for in this paragraph without first seeking an order of this Court finding that they are proper parties with standing, or authorizing them to bring, such Challenge. In the event of the filing of such a Challenge by the Stockholders, or any of them, however, all other parties'-in-interest rights to object to such Challenge on any ground, including that the Stockholders are not the proper parties or lack standing to assert such Challenge, shall be fully reserved for adjudication after the filing of such Challenge.

30.    As a result of merely providing the DIP Facility and permitting the use of Cash Collateral, or merely exercising any rights or remedies as and when permitted pursuant to this Final Order, the DIP Credit Documents or the Prepetition Credit Documents, as applicable, neither the DIP Lender nor the Prepetition Secured Lender shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).

Dated: January __, 2012      JAN 26 2012

_____
UNITED STATES BANKRUPTCY JUDGE

DEBTOR IN POSSESSION
LOAN AND SECURITY AGREEMENT

among

DELAWARE STREET CAPITAL MASTER FUND, L.P.,

as Lender

and

HARTFORD COMPUTER GROUP, INC.,

NEXICORE SERVICES, LLC,

HARTFORD COMPUTER HARDWARE, INC.

and

HARTFORD COMPUTER GOVERNMENT, INC.,

as Borrowers

DATED AS OF DECEMBER 12, 2011

1999238_8

## TABLE OF CONTENTS

Page

ARTICLE 1   DEFINITIONS. ................................................................................ 2
     Section 1.1   Definitions ................................................................................ 2

ARTICLE 2   LOANS. ......................................................................................... 8
     Section 2.1   Loans ..................................................................................... 8
     Section 2.2   Repayments ........................................................................... 9
     Section 2.3   Notes ..................................................................................... 9

ARTICLE 3   INTENTIONALLY OMITTED ................................................... 9

ARTICLE 4   INTEREST, FEES AND CHARGES. ........................................ 9
     Section 4.1   Interest Rates ........................................................................ 9
     Section 4.2   Costs and Expenses ............................................................ 10
     Section 4.3   Maximum Interest .............................................................. 10

ARTICLE 5   COLLATERAL .............................................................................. 10
     Section 5.1   Grant of Security Interest to Lender ................................. 10
     Section 5.2   Intentionally omitted ......................................................... 12
     Section 5.3   Possessory Collateral ........................................................ 12
     Section 5.4   Electronic Chattel Paper .................................................... 12

ARTICLE 6   PRESERVATION OF COLLATERAL AND PERFECTION OF
              SECURITY INTERESTS THEREIN. ...................................... 12

ARTICLE 7   INTENTIONALLY OMITTED ................................................... 13

ARTICLE 8   COLLECTIONS. ........................................................................... 13

ARTICLE 9   COLLATERAL, AVAILABILITY AND FINANCIAL REPORTS AND
              SCHEDULES ............................................................................ 14
     Section 9.1   Bankruptcy Court ............................................................... 14
     Section 9.2   Monthly Reports ................................................................ 14
     Section 9.3   Financial Statements ......................................................... 14
     Section 9.4   Budget ................................................................................ 14
     Section 9.5   Prepetition Obligations Information and Notices .............. 15
     Section 9.6   Other Information ............................................................... 15

ARTICLE 10   TERMINATION. .......................................................................... 15

ARTICLE 11   REPRESENTATIONS AND WARRANTIES ............................. 15
     Section 11.1   Financial Statements and Other Information ................... 15
     Section 11.2   Locations .......................................................................... 16
     Section 11.3   Loans by Obligors ........................................................... 16
     Section 11.4   Intentionally omitted ....................................................... 16

Section 11.5    Liens ................................................................................ 16
Section 11.6    Organization, Authority and No Conflict ..................................... 16
Section 11.7    Litigation ........................................................................... 16
Section 11.8    Compliance with Laws and Maintenance of Permits ................... 17
Section 11.9    Affiliate Transactions ............................................................ 17
Section 11.10   Names and Trade Names ......................................................... 17
Section 11.11   Equipment .......................................................................... 17
Section 11.12   Enforceability ..................................................................... 17
Section 11.13   Intentionally omitted ............................................................ 17
Section 11.14   Indebtedness ....................................................................... 17
Section 11.15   Margin Security and Use of Proceeds ......................................... 17
Section 11.16   Subsidiaries and Affiliates ...................................................... 18
Section 11.17   No Defaults ......................................................................... 18
Section 11.18   Employee Matters ................................................................. 18
Section 11.19   Intellectual Property ............................................................. 18
Section 11.20   Environmental Matters ........................................................... 18
Section 11.21   ERISA Matters ..................................................................... 19
Section 11.22   Disclosure .......................................................................... 19
Section 11.23   Lockbox, Deposit, Checking and Other Accounts ....................... 19

ARTICLE 12 AFFIRMATIVE COVENANTS .................................................... 19
Section 12.1    Maintenance of Records .......................................................... 19
Section 12.2    Notices .............................................................................. 19
Section 12.3    Compliance with Laws and Maintenance of Permits ................... 21
Section 12.4    Inspection and Audits ............................................................ 21
Section 12.5    Insurance ........................................................................... 21
Section 12.6    Collateral ........................................................................... 23
Section 12.7    Use of Proceeds ................................................................... 23
Section 12.8    Taxes ................................................................................ 23
Section 12.9    Intellectual Property ............................................................. 23
Section 12.10   Lockbox, Deposit, Checking and Other Accounts ....................... 24

ARTICLE 13 NEGATIVE COVENANTS ......................................................... 24
Section 13.1    Guaranties .......................................................................... 24
Section 13.2    Indebtedness ....................................................................... 24
Section 13.3    Liens ................................................................................. 24
Section 13.4    Mergers, Sales, Acquisitions, Subsidiaries and Other Transactions
                Outside the Ordinary Course of Business ................................... 24
Section 13.5    Dividends and Distributions .................................................... 25
Section 13.6    Investments; Loans ............................................................... 25
Section 13.7    Fundamental Changes, Line of Business ..................................... 25
Section 13.8    Equipment .......................................................................... 25
Section 13.9    Affiliate Transactions ............................................................ 25
Section 13.10   Settling of Accounts .............................................................. 25
Section 13.11   Management Fees; Compensation ............................................. 25
Section 13.12   Restriction on Amendment to Certain Documents ....................... 25
Section 13.13   Prepayment of Certain Indebtedness ......................................... 25

Section 13.14  The Order ..................................................................................... 26
Section 13.15  The Budget .................................................................................. 26

ARTICLE 14  FINANCIAL COVENANTS. ................................................................. 26
Section 14.1  Budget ........................................................................................... 26

ARTICLE 15  DEFAULT. ............................................................................................. 26
Section 15.1   Payment........................................................................................ 26
Section 15.2   Breach of this Agreement and the Other Agreements ................. 26
Section 15.3   Breaches of Other Obligations. .................................................... 26
Section 15.4   Breach of Representations and Warranties ................................... 27
Section 15.5   Loss of Collateral ......................................................................... 27
Section 15.6   Levy, Seizure or Attachment ....................................................... 27
Section 15.7   Judgment....................................................................................... 27
Section 15.8   Dissolution of Obligor; Cessation of Business ............................ 27
Section 15.9   Default or Revocation of Guaranty .............................................. 27
Section 15.10  Criminal Proceedings................................................................... 27
Section 15.11  Material Adverse Change ............................................................ 27
Section 15.12  This Agreement, Other Agreements and Orders.......................... 27
Section 15.13  Order Defaults.............................................................................. 27

ARTICLE 16  REMEDIES UPON AN EVENT OF DEFAULT.................................... 28

ARTICLE 17  CONDITIONS PRECEDENT. ............................................................... 28

ARTICLE 18  INDEMNIFICATION. ........................................................................... 30

ARTICLE 19  NOTICE. ................................................................................................ 30

ARTICLE 20  CHOICE OF GOVERNING LAW; CONSTRUCTION; FORUM
SELECTION. ......................................................................................... 31

ARTICLE 21  MODIFICATION AND BENEFIT OF AGREEMENT.......................... 31

ARTICLE 22  HEADINGS OF SUBDIVISIONS. ........................................................ 32

ARTICLE 23  POWER OF ATTORNEY. ...................................................................... 32

ARTICLE 24  CONFIDENTIALITY.............................................................................. 32

ARTICLE 25  COUNTERPARTS. ................................................................................. 32

ARTICLE 26  CONFLICT OF TERMS.......................................................................... 33

ARTICLE 27  WAIVER OF JURY TRIAL; OTHER WAIVERS. ................................ 33

ARTICLE 28  JOINT AND SEVERAL LIABILITY. .................................................... 34

## LIST OF EXHIBITS AND SCHEDULES

EXHIBIT A -- COMMERCIAL TORT CLAIMS

EXHIBIT B – CLOSING DOCUMENT CHECKLIST

SCHEDULE 11.2 -- BUSINESS AND COLLATERAL LOCATIONS

SCHEDULE 11.7 -- LITIGATION

SCHEDULE 11.9 - AFFILIATE TRANSACTIONS

SCHEDULE 11.10 - NAMES & TRADE NAMES

SCHEDULE 11.16 - PARENT, SUBSIDIARIES AND AFFILIATES

SCHEDULE 11.19 - INTELLECTUAL PROPERTY

SCHEDULE 11.23 - LOCKBOX, DEPOSIT AND OTHER ACCOUNTS

## DEBTOR IN POSSESSION
## LOAN AND SECURITY AGREEMENT

**THIS DEBTOR IN POSSESSION LOAN AND SECURITY AGREEMENT** (*as further amended, supplemented or otherwise modified from time to time, this "Agreement"*) made this 12th day of December, 2011, by and among **DELAWARE STREET CAPITAL MASTER FUND, L.P.,** a Cayman Islands exempt limited partnership, having its principal place of business at 900 North Michigan Street Suite 1900 Chicago, Illinois 60611 (*"Lender"*), **HARTFORD COMPUTER GROUP, INC.,** a Delaware corporation, as debtor in possession under the Bankruptcy Code, having its principal place of business at 3949 Heritage Oaks Court, Building B, Simi Valley, California 93063 (*"HCG"*), **NEXICORE SERVICES, LLC,** a Delaware limited liability company, as debtor in possession under the Bankruptcy Code, having its principal place of business at 3949 Heritage Oaks Court, Building B, Simi Valley, California 93063 (*"Nexicore"*), **HARTFORD COMPUTER HARDWARE, INC.,** an Illinois corporation, as debtor in possession under the Bankruptcy Code, having its principal place of business at 3949 Heritage Oaks Court, Building B, Simi Valley, California 93063 (*"Hardware"*), and **HARTFORD COMPUTER GOVERNMENT, INC.,** an Illinois corporation, as debtor in possession under the Bankruptcy Code, having its principal place of business at 3949 Heritage Oaks Court, Building B, Simi Valley, California 93063 (*"Government"* and collectively, with HCG, Nexicore and Hardware, the *"Borrowers"* or *"Obligors"* and individually, *a "Borrower"* or *"Obligor"*).

### W I T N E S S E T H :

**WHEREAS,** on December 12, 2011 (the *"Petition Date"*), the Obligors filed a voluntary petition for relief (collectively, the *"Cases"*) under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Northern District of Illinois Eastern Division (the *"Bankruptcy Court"*);

**WHEREAS,** the Obligors are continuing to operate their respective businesses and manage their respective properties as debtors in possession under Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS,** the Borrowers have requested that the Lender provide a secured debtor in possession revolving credit facility of up to $14,400,000 in order to fund the continued operation of the businesses of the Obligors as debtors and debtors in possession under the Bankruptcy Code;

**WHEREAS,** the Lender is willing to make available to the Borrowers post-petition loans upon the terms and subject to the conditions set forth in this Agreement; and

**WHEREAS,** each Borrower has agreed to secure all of its Liabilities (as defined below) by granting to the Lender a lien on substantially all of its assets, subject only to the Carve-Out (as defined below).

**NOW, THEREFORE,** in consideration of the premises and the agreements, provisions and covenants herein contained, and for other good and valuable consideration, the

receipt and sufficiency of which are hereby acknowledged by the Obligors, the parties to this Agreement agree as follows:

# ARTICLE 1

## DEFINITIONS.

Section 1.1    <u>Definitions</u>.  In this Agreement the following terms shall have the following meanings:

**"Account"**, **"Account Debtor"**, **"Chattel Paper"**, **"Commercial Tort Claims"**, **"Contract Rights"**, **"Deposit Accounts"**, **"Documents"**, **"Electronic Chattel Paper"**, **"Equipment"**, **"Fixtures"**, **"General Intangibles"**, **"Goods"**, **"Instruments"**, **"Inventory"**, **"Investment Property"**, **"Letter-of-Credit Right"**, **"Payment Intangibles"**, **"Proceeds"**, **"Supporting Obligations"** and **"Tangible Chattel Paper"** shall have the respective meanings assigned to such terms in the Illinois Uniform Commercial Code, as the same may be in effect from time to time.

**"Adequate Protection Liens"** shall have the meaning specified in the Order.

**"Affiliate"** shall mean any Person:  (i) which, in each case directly or indirectly through one or more intermediaries, controls (including but not limited to all directors and officers of such Person), is controlled by, or is under common control with, any Obligor, (ii) which beneficially owns or holds five percent (5%) or more of the voting control or equity interests of any Obligor, or (iii) five percent (5%) or more of the voting control or equity interests of which is beneficially owned or held by any Loan Party.  The term "control" *(including the terms "controlled by" and "under common control with")* means the possession, directly or indirectly, of the power to cause the direction of the management and policies of the Person in question whether through the ownership of voting securities, by contract or otherwise; provided however that neither Lender nor its Affiliates shall be considered Affiliates of any Obligor or its Affiliates.

**"Affiliate Party"** shall have the meaning specified in Section 13.9 hereof.

**"Agreement"** shall have the meaning specified in the preamble hereto.

**"Avoidance Actions"** shall have the meaning specified in the Order.

**"Bankruptcy Code"** shall have the meaning specified in Section 28(B) hereof.

**"Bankruptcy Court"** shall have the meaning specified in the first recital hereto.

**"Borrower"** or **"Borrowers"** shall have the meaning specified in the preamble hereto.

**"Borrowing Date"** shall have the meaning specified in Section 2.1(B) hereof.

**"Budget"** shall have the meaning specified in the Order.

2

"**Business Day**" shall mean any day other than a Saturday, a Sunday or any day that banks in Chicago, Illinois are required or permitted to close.

"**Carve-Out**" shall have the meaning specified in the Order.

"**Capital Stock**" shall mean any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"**Cases**" shall have the meaning specified in the first recital hereto.

"**Closing Date**" shall mean the first date on which all of the conditions set forth in Article 17 hereof have been satisfied (or waived by the Lender in its sole and absolute discretion).

"**Collateral**" shall mean, collectively, all of the property and assets and all interests therein and proceeds thereof now owned or hereafter acquired by any Obligor upon which a lien is granted or purported to be granted by such Obligor to the Lender pursuant to this Agreement or any Other Agreement to secure repayment of any of the Liabilities.

"**Committee**" shall mean the Official Committee of Unsecured Creditors appointed in the Cases.

"**DIP Liens**" shall have the meaning specified in the Order.

"**Environmental Laws**" shall mean, with respect to any Person, all federal, state, district, local and foreign laws, rules, regulations, ordinances, and consent decrees relating to health, safety, hazardous substances, pollution and environmental matters, as now or at any time hereafter in effect, applicable to such Person's business or facilities owned or operated by such Person, including laws relating to emissions, discharges, releases or threatened releases of pollutants, contamination, chemicals, or hazardous, toxic or dangerous substances, materials or wastes into the environment (*including, without limitation, ambient air, surface water, ground water, and surface or subsurface strata*) or otherwise relating to the generation, manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended, modified or restated from time to time.

"**Event of Default**" shall have the meaning specified in Article 15 hereof.

"**Final Financing Order**" shall mean an order of the Bankruptcy Court pursuant to Section 364 of the Bankruptcy Code, in form and substance satisfactory to the Lender, approving this Agreement and the Other Agreements, authorizing the incurrence by the Borrowers of permanent post-petition secured Indebtedness in accordance with this Agreement, as to which no stay has been entered that has not been reversed, modified, vacated or overturned.

3

**"First Day Orders"** shall mean all orders entered by the Bankruptcy Court in the Cases on or about the Petition Date.

**"Fiscal Quarter"** shall mean a period of three consecutive calendar months ending on the last day of March, June, September or December.

**"Fiscal Year"** shall mean each twelve (*12*) month accounting period of HCG and its Subsidiaries, which ends on December 31st of year.

**"Government"** shall have the meaning specified in the preamble hereto.

**"Hardware"** shall have the meaning specified in the preamble hereto.

**"Hazardous Materials"** shall mean any hazardous, toxic or dangerous substance, materials and wastes, including, without limitation, hydrocarbons (*including naturally occurring or man-made petroleum and hydrocarbons*), flammable explosives, asbestos, urea formaldehyde insulation, radioactive materials, biological substances, polychlorinated biphenyls, pesticides, herbicides and any other kind and/or type of pollutants or contaminants (*including, without limitation, materials which include hazardous constituents*), sewage, sludge, industrial slag, solvents and/or any other similar substances, materials, or wastes and including any other substances, materials or wastes that are or become regulated under any Environmental Law (*including, without limitation any that are or become classified as hazardous or toxic under any Environmental Law*).

**"HCG"** shall have the meaning specified in the preamble hereto.

**"HCG Financial"** shall mean HCG Financial Services, Inc., an Illinois corporation,

**"Indebtedness"** of any Person shall mean, without duplication, (a) all borrowed money of such Person, whether or not evidenced by bonds, debentures, notes or similar instruments, (b) all obligations of such Person as lessee under capital leases which have been or should be recorded as liabilities on a balance sheet of such Person in accordance with GAAP, (c) all obligations of such Person to pay the deferred purchase price of property or services (excluding trade accounts payable in the ordinary course of business), (d) all indebtedness secured by a Lien on the property of such Person, whether or not such indebtedness shall have been assumed by such Person; provided that if such Person has not assumed or otherwise become liable for such indebtedness, such indebtedness shall be measured at the fair market value of such property securing such indebtedness at the time of determination, (e) all obligations, contingent or otherwise, with respect to the face amount of all letters of credit (whether or not drawn), bankers' acceptances and similar obligations issued for the account of such Person, (f) all hedging obligations of such Person, (g) all contingent liabilities of such Person, (h) all Indebtedness of any partnership of which such Person is a general partner and (i) any capital security or other equity instrument, whether or not mandatorily redeemable, that under GAAP is characterized as debt.

**"Indemnified Party"** shall have the meaning specified in Section 18 hereof.

4

"**Intellectual Property**" shall mean, with respect to any Person, all of the following owned by, issued to, or licensed to such Person or used in connection with or relating to the operation of such Person's business: (i) patents, patent applications, patent disclosures and inventions (whether or not patentable and whether or not reduced to practice) and any reissues, continuations, continuations-in-part, divisions, extensions or reexaminations thereof; (ii) trademarks, trade styles, service marks, trade dress, logos, slogans, trade names, corporate names, company names, business names, fictitious business names and other business identifiers and any derivation of any of the foregoing and all registrations and applications for registration thereof, together with all goodwill associated therewith; (iii) copyrights and works of authorship, and all registrations and applications for registration thereof; (iv) computer software (including, without limitation, data, data bases and related documentation); (v) trade secrets, confidential information, and proprietary data and information (including, without limitation, compilations of data (whether or not copyrighted or copyrightable), ideas, formulae, compositions, blends, processes, know-how, manufacturing and production processes and techniques, research and development information, drawings, specifications, designs, plans, improvements, proposals, technical data, financial and accounting data, business and marketing plans, and customer lists, customer information, pricing information, pricing schedules, supplier information and related information); (vi) all other intellectual property rights; and (vii) all copies and tangible embodiments of the foregoing (in whatever form or medium).

"**Interim Financing Order**" shall mean that certain Interim Order (I) Authorizing the Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. § 364, (II) Authorizing the Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection to the Prepetition Secured Lender pursuant to 11 U.S.C. §§ 361 and 363, and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001, issued by the Bankruptcy Court in form and substance satisfactory to the Lender.

"**Lender**" shall have the meaning specified in the preamble thereto.

"**Liabilities**" shall mean any and all obligations, liabilities and indebtedness of each Obligor to the Lender under this Agreement or any of the Other Agreements of any and every kind and nature, howsoever created, arising or evidenced and howsoever owned, held or acquired, whether now or hereafter existing, whether now due or to become due, whether primary, secondary, direct, indirect, absolute, contingent or otherwise (*including, without limitation, obligations of performance*), whether several, joint or joint and several, and whether arising or existing under written or oral agreement or by operation of law.

"**Lien**" means any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to given any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing.

"**Loans**" shall mean all Revolving Loans.

"**Lock Box**" and "**Lock Box Account**" shall have the meanings specified in Section 8(A) hereof.

5

"**Material Adverse Effect**" shall mean a material adverse effect on and/or material adverse developments with respect to (i) the business, property, assets, operations, liabilities or condition (financial or otherwise) of the Obligors, taken as a whole, (ii) the ability of any Obligor to fully and timely perform its Liabilities, (iii) the legality, validity, binding effect or enforceability against an Obligor of this Agreement or any Other Agreement to which it is a party, (iv) the Collateral or the Lenders' liens on the Collateral, or (v) the rights, remedies and benefits available to, or conferred upon, the Lender under this Agreement or any Other Agreement; it being understood that the commencement of the Cases and the events and conditions which customarily occur as a result of events leading up to and following the commence of a proceeding under Chapter 11 of the Bankruptcy Code shall not be deemed a Material Adverse Effect.

"**MRR**" shall mean MRR Venture LLC, an Illinois limited liability company.

"**MRR Note**" means that certain Substituted and Amended Subordinated Promissory Note, dated May 9, 2005 by HCG in favor of MRR, as amended in accordance with the terms of this Agreement.

"**Nexicore**" shall have the meaning specified in the preamble hereto.

"**Obligor**" or "**Obligors**" shall have the meaning specified in the preamble hereto.

"**Order**" shall mean, collectively, the Interim Financing Order and/or the Final Financing Order, as applicable.

"**Other Agreements**" shall mean all agreements, instruments and documents, other than this Agreement, including, without limitation, guaranties, mortgages, trust deeds, pledges, powers of attorney, consents, assignments, contracts, notices, security agreements, leases, financing statements and all other writings heretofore, now or from time to time hereafter executed by or on behalf of any Borrower, any other Obligor or any other Person and delivered to Lender in connection with the Liabilities or the transactions contemplated hereby, as each of the same may be amended, modified or supplemented from time to time.

"**PBGC**" shall have the meaning specified in Section 12.2(e) hereof.

"**Permitted Dispositions**" shall mean dispositions of inventory in the ordinary course of business.

"**Permitted Liens**" shall mean (i) statutory Liens of landlords, carriers, warehousemen, processors, mechanics, materialmen or suppliers incurred in the ordinary course of business and securing amounts not yet due or declared to be due by the claimant thereunder; (ii) zoning restrictions and easements, licenses, covenants and other restrictions affecting the use of real property that do not individually or in the aggregate have a material adverse effect on an the value of such property or any Obligor's ability to use such real property for its intended purpose in connection with such Obligor's business; (iii) DIP Liens; (iv) Prepetition Secured Lender Liens; (v) Adequate Protection Liens; and (vi) Liens immediately junior in priority to any and all valid, properly perfected, enforceable and non-avoidable Liens other than the Primed Liens on

assets of the Obligors in existence as of the Petition Date, but only to the extent such Liens are senior in priority to the Primed Liens.

**"Person"** shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, entity, party or foreign or United States government (*whether federal, state, county, city, municipal or otherwise*), including, without limitation, any instrumentality, division, agency, body or department thereof.

**"Petition Date"** shall have the meaning specified in the first recital hereto.

**"Plan"** shall have the meaning specified in Section 12.2(e) hereof.

**"PO Note"** shall mean that certain Subordinated Promissory Note dated as of May 9, 2005 by Hartford in favor of HCG Financial, as amended in accordance with the terms of this Agreement.

**"Prepetition Collateral"** shall have the meaning specified in the Order.

**"Prepetition Secured Lender"** shall mean Delaware Street Capital Master Fund, L.P., a Cayman Islands exempt limited partnership.

**"Prepetition Secured Lender Liens"** shall mean Liens against the Prepetition Collateral existing on the Petition Date in favor of the Prepetition Secured Lender securing the Prepetition Obligations.

**"Prepetition Credit Documents"** shall have the meaning specified in the Order.

**"Prepetition Obligations"** shall have the meaning specified in the Order.

**"Primed Liens"** shall have the meaning specified in the Order.

**"Prime Rate"** shall mean the publicly announced prime rate of Bank of America, N.A. (*which rate is not intended to be its lowest or most favorable rate in effect at any time*) in effect from time to time.

**"Reporting Date"** shall have the meaning specified in Section 9.6 hereof.

**"Revolving Commitment"** means the commitment of the Lender to make or otherwise fund Revolving Loans in an aggregate amount not to exceed $14,400,000.

**"Revolving Loans"** shall have the meaning set forth in Section 2.1(B) hereof.

**"Sale"** shall mean the sale or other disposition by the Obligors of all or substantially all of the Obligors' assets on terms and for a purchase price satisfactory to the Lender in all respects, as permitted pursuant to an order entered in connection with the Sale Motion.

"**Sale Motion**" shall mean that certain motion filed by the Obligors with the Bankruptcy Court on December 12, 2011 and identified as item number 23 on the Bankruptcy Court's docket in the jointly administered Cases (Case No. 11-49-744), as it may be amended thereafter, for the sale of all or substantially all of the Obligors' assets.

"**Stated Maturity Date**" shall mean May 18, 2012.

"**Subsidiary**" of any Person shall mean any corporation of which more than fifty percent (50%) of the outstanding capital stock having ordinary voting power to elect a majority of the board of directors of such corporation (*irrespective of whether at the time stock of any other class of such corporation shall have or might have voting power by reason of the happening of any contingency*) is at the time, directly or indirectly, owned by such person, or any partnership, joint venture or limited liability company of which more than fifty percent (50%) of the outstanding equity interests are at the time, directly or indirectly, owned by such Person or any partnership of which such Person is a general partner.

"**Term**" shall mean the period commencing on the Closing Date to, but excluding, the Termination Date.

"**Termination Date**" shall mean the earliest to occur of (i) the Stated Maturity Date; (ii) forty-five (45) days after the entry of the Interim Financing Order if the Final Financing Order, which shall be in form and substance satisfactory to the Lender, shall not have been entered on or before such date; (iii) the occurrence of the effective date under any plan or reorganization or liquidation for the Borrowers; and (iv) the completion of a Sale; (v) upon the Lender's election by written notice to the Borrowers, the occurrence and continuance of an Event of Default.

"**Total Utilization of Revolving Commitment**" shall mean, as at any date of determination and without duplication, the aggregate principal amount of all outstanding Revolving Loans.

## ARTICLE 2

## LOANS.

Section 2.1    Loans.

(A)    Revolving Commitment. During the Term, subject to the terms and conditions of this Agreement, the Lender agrees to make revolving loans and advances (the *"Revolving Loans"*) in an aggregate amount up to but not exceeding the Revolving Commitment; provided, that after giving effect to the making of any Revolving Loans in no event shall the Total Utilization of Revolving Commitment exceed the lesser of (x) the amount shown as outstanding Revolving Loans on the Budget, and (y) the Revolving Commitment then in effect.  Amounts borrowed pursuant to this Section 2.1(A) may be repaid and reborrowed during the Term.

(B)    Borrowing Mechanics for Revolving Loans.

(i)    A Revolving Loan may only be made on Thursday of each week (*or, if such day is not a Business Day, on the next succeeding Business Day; each such day, a "Borrowing Date"*) upon at least one (1) Business Day prior notice to Lender and received by Lender no later than 4:00 pm (New York time) on such Business Day, which notice shall set forth the following information:  (a) the amount of the requested Revolving Loan, and (b) the representations in Sections 17.2 (A) and (B) hereof.

(iii)    Each Borrower hereby irrevocably authorizes Lender to disburse the proceeds of each Revolving Loan requested by such Borrower, or deemed to be requested by such Borrower, as follows:  the proceeds of each Loan shall be disbursed by Lender in lawful money of the United States of America in immediately available funds by wire transfer to such bank account as may be agreed upon by such Borrower and Lender from time to time, or elsewhere if pursuant to a written direction from such Borrower.

Section 2.2    Repayments.  The Borrowers shall be jointly and severally liable, and each Borrower hereby unconditionally promises, to repay the Loans and other Liabilities as follows:

(a)    Repayment of Liabilities.  The Revolving Loans shall be repaid in full upon the Termination Date.

(b)    Mandatory Prepayments of Loans and Liabilities.  Except for Permitted Dispositions, upon receipt of the proceeds of the sale or other disposition of any Collateral of any Obligor (including, without limitation, the Sale or any non-ordinary course sale or other disposition approved pursuant to Section 363 of the Bankruptcy Code), such proceeds shall be applied to the Liabilities in such order as determined by Lender, in its sole and absolute discretion.

(c)    Revolving Loans.  Borrowers may from time to time prepay the Lenders to the extent necessary so that the Total Utilization of Revolving Commitment shall not at any time exceed the lesser of (x) the amount shown as outstanding Revolving Loans on the Budget, and (y) the Revolving Commitment then in effect.

Section 2.3    Notes.  The Loans shall be evidenced by one or more promissory notes in form and substance reasonably satisfactory to Lender.

## ARTICLE 3

## INTENTIONALLY OMITTED

## ARTICLE 4

## INTEREST, FEES AND CHARGES.

Section 4.1    Interest Rates.  Subject to the terms and conditions set forth below:

9

(A)  the Revolving Loans shall bear interest at the per annum rate of the Prime Rate plus seven and one-quarter of one percent (7.25%), in each case, payable on the last Business Day of each month in arrears.

(B)    Upon the occurrence of an Event of Default and the election of the Lender by written notice to the Borrowers, the Loans shall bear interest at the rate of two percent (2%) per annum in excess of the interest rate otherwise payable thereon, which interest shall be payable on demand.

(C)    All interest shall be calculated on the basis of a 360-day year.

(D)    Any interest, fees or other Liabilities (other than Loans) owing hereunder which are not paid when due hereunder shall, to the extent permitted by applicable law, bear interest at a per annum rate equal to the rate applicable to Revolving Loans plus two percent (2.0%) per annum.

Section 4.2     Costs and Expenses.  Borrowers shall be jointly and severally liable to reimburse Lender for all costs and expenses, including, without limitation, legal expenses and reasonable attorneys' fees, incurred by Lender in connection with the:   (i) documentation and consummation of this transaction and any other transactions between Borrower and Lender, including, without limitation, Uniform Commercial Code and other public record searches and filings, overnight courier or other express or messenger delivery, appraisal costs, surveys, title insurance and environmental audit or review costs; (ii) collection, protection or enforcement of any rights in or to the Collateral; (iii) collection of any Liabilities; and (iv) administration and enforcement of any of Lender's rights under this Agreement or any Other Agreement.  Borrowers shall be jointly and severally liable to also pay any additional services requested by a Borrower from Lender.  All such costs, expenses and charges shall constitute Liabilities hereunder, shall be payable by Borrowers to Lender on demand and until paid shall bear interest at the highest rate then applicable to Loans hereunder.

Section 4.3     Maximum Interest.  It is the intent of the parties that the rate of interest and other charges to Borrowers under this Agreement and the Other Agreements shall be lawful; therefore, if for any reason the interest or other charges payable under this Agreement are found by a court of competent jurisdiction, in a final determination, to exceed the limit which Lender may lawfully charge Borrowers, then the obligation to pay interest and other charges shall automatically be reduced to such limit and, if any amount in excess of such limit shall have been paid, then such amount shall be refunded to Borrowers.

## ARTICLE 5

## COLLATERAL.

Section 5.1     Grant of Security Interest to Lender.  As security for the prompt and complete payment and performance when due of all Liabilities, each Obligor hereby assigns to Lender and grants to Lender a continuing security interest in all of the right, title and interest of such Obligor in, to and under all of the following of such Grantor, whether now or hereafter owned, existing, acquired or arising and wherever now or hereafter located:

10

(a) all Accounts;

(b) all Goods;

(c) all Chattel Paper;

(d) all Instruments;

(e) all Documents;

(f) all General Intangibles, including, but not limited to, all Contract Rights and Intellectual Property;

(g) all Inventory;

(h) all Equipment;

(i) all Fixtures;

(j) all Investment Property;

(k) all Payment Intangibles;

(l) all Deposit Accounts, together with all monies, securities and instruments at any deposited in any such account or otherwise held for the credit thereof;

(m) all Letter-of-Credit Rights;

(n) all Supporting Obligations;

(o) Commercial Tort Claims listed on Exhibit A hereto;

(p) any other property now or hereafter in the possession, custody or control of Lender or any agent or any parent, affiliate or subsidiary of Lender or any participant with Lender in the Loans, for any purpose (*whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise*);

(q) all additions and accessions to, substitutions for, and replacements, products and Proceeds of the foregoing property, including, without limitation, proceeds of all insurance policies insuring the foregoing property; and

(r) all books and records (including customer lists, files, correspondence, computer programs, print-outs and computer records) relating to any of the foregoing and to such Obligor's business;

provided, however, notwithstanding the foregoing, to the extent (and only to the extent) Avoidance Actions are excluded from Collateral pursuant to the Final Order, upon entry of the Final Order, no Lien shall be hereby granted on any Avoidance Actions.

11

Section 5.2      Intentionally omitted.

Section 5.3      Possessory Collateral.  Immediately upon an Obligor's receipt of any portion of the Collateral evidenced by an agreement, Instrument or Document, including, without limitation, any Tangible Chattel Paper and any Investment Property consisting of certificated securities in an aggregate amount in excess of $50,000 for all such Collateral received by the Obligors during the term of this Agreement, such Obligor shall deliver the original thereof to Lender together with an appropriate endorsement or other specific evidence of assignment thereof to Lender (*in form and substance acceptable to Lender*).  If an endorsement or assignment of any such items shall not be made for any reason, Lender is hereby irrevocably authorized, as such Obligor's attorney and agent-in-fact, to endorse or assign the same on such Obligor's behalf.

Section 5.4      Electronic Chattel Paper.  To the extent that an Obligor obtains or maintains any Electronic Chattel Paper in an aggregate amount in excess of $50,000 for all Electronic Chattel Paper received by the Obligors during the term of this Agreement, such Obligor shall create, store and assign the record or records comprising the Electronic Chattel Paper in such a manner that:  (i) a single authoritative copy of the record or records exists which is unique, identifiable and except as otherwise provided in clauses (iv), (v) and (vi) below, unalterable, (ii) the authoritative copy identifies Lender as the assignee of the record or records, (iii) the authoritative copy is communicated to and maintained by the Lender or its designated custodian, (iv) copies or revisions that add or change an identified assignee of the authoritative copy can only be made with the participation of Lender, (v) each copy of the authoritative copy and any copy of a copy is readily identifiable as a copy that is not the authoritative copy and (vi) any revision of the authoritative copy is readily identifiable as an authorized or unauthorized revision.

## ARTICLE 6

## PRESERVATION OF COLLATERAL AND
## PERFECTION OF SECURITY INTERESTS THEREIN.

Each Obligor shall, at Lender's request, at any time and from time to time, authenticate, execute and deliver to Lender such financing statements, documents and other agreements and instruments (*and pay the cost of filing or recording the same in all public offices deemed necessary or desirable by Lender*) and do such other acts and things or cause third parties to do such other acts and things as Lender may deem necessary or desirable in its sole discretion in order to establish and maintain a valid, attached and perfected security interest in the Collateral in favor of Lender (*free and clear of all other liens, claims, encumbrances and rights of third parties whatsoever, whether voluntarily or involuntarily created, except Permitted Liens*) to secure payment of the Liabilities, and in order to facilitate the collection of the Collateral.  Each Obligor irrevocably hereby makes, constitutes and appoints Lender (*and all Persons designated by Lender for that purpose*) as such Obligor's true and lawful attorney and agent-in-fact to execute and file such financing statements, documents and other agreements and instruments and do such other acts and things as may be necessary to preserve and perfect Lender's security interest in the Collateral.   Such financing statements may describe the Collateral in the same manner as described in this Agreement or may contain an indication or

12

description of collateral that describes such property in any other manner as the Lender may determine, in its sole discretion, is necessary, advisable or prudent to ensure the perfection of the security interest in the collateral granted to the Lender, including, without limitation, describing such property as "all assets" or "all personal property whether now owned or hereafter owned, existing, acquired or arising and wherever now or hereafter located." Each Obligor further agrees that a carbon, photographic, photostatic or other reproduction of this Agreement or of a financing statement shall be sufficient as a financing statement. Each Obligor further ratifies and confirms the prior filing by Lender of any and all financing statements which identify such Obligor as debtor, Lender as secured party and any or all Collateral as collateral.

## ARTICLE 7

## INTENTIONALLY OMITTED.

## ARTICLE 8

## COLLECTIONS.

(A)    Following five (5) Business Days' written notice to the Obligors and counsel to the Committee with respect to any of the foregoing actions in respect of any Account Debtor, Lender may, at any time and from time to time, whether before or after the occurrence of an Event of Default and whether before or after notification to any Account Debtor and whether before or after the maturity of any of the Liabilities, (i) enforce collection of any Obligor's Accounts or other amounts owed to an Obligor by suit or otherwise; (ii) exercise all of any Obligor's rights and remedies with respect to proceedings brought to collect any Accounts or other amounts owed to such Obligor; (iii) surrender, release or exchange all or any part of any Accounts or other amounts owed to an Obligor, or compromise or extend or renew for any period (*whether or not longer than the original period*) any indebtedness thereunder; (iv) sell or assign any Account of an Obligor or other amount owed to an Obligor upon such terms, for such amount and at such time or times as Lender deems advisable; (v) prepare, file and sign an Obligor's name on any proof of claim in bankruptcy or other similar document against any Account Debtor or other Person obligated to such Obligor; and (vi) do all other acts and things which are necessary, in Lender's sole discretion, to fulfill any Obligor's obligations under this Agreement and the Other Agreements and to allow Lender to collect the Accounts or other amounts owed to any Obligor. In addition to any other provision hereof, Lender may at any time, whether before or after the occurrence of an Event of Default, at Borrowers' expense, notify any parties obligated on any of the Accounts to make payment directly to Lender of any amounts due or to become due thereunder.

(B)    On a monthly basis, Lender shall deliver to Borrowers and counsel for the Committee an account statement showing all Loans, charges and payments, which shall be deemed final, binding and conclusive upon Borrowers unless a Borrower notifies Lender in writing, specifying any error therein, within thirty (*30*) days of the date such account statement is sent to Borrowers and any such notice shall only constitute an objection to the items specifically identified.

## ARTICLE 9

## COLLATERAL, AVAILABILITY AND FINANCIAL REPORTS AND SCHEDULES.

Section 9.1     Bankruptcy Court.  As soon as available, copies of all material pleadings, motions and other documents filed on behalf of any Obligor with the Bankruptcy Court shall be delivered to the Lender; provided, however, that copies of any filings with the Bankruptcy Court shall be deemed delivered if notice thereof is automatically received by Lender's counsel upon the occurrence of such filing through the Bankruptcy Court's electronic court filing ("*ECF*") notification system.

Section 9.2     Monthly Reports.  Borrowers shall deliver to Lender, in addition to any other reports, as soon as practicable and in any event: (i) within fifteen (*15*) days after the end of each month, (A) a detailed trial balance of each Obligor's Accounts aged per invoice date, in form and substance satisfactory to Lender including, without limitation, the names (*and addresses*) of all Account Debtors of Obligor, and (B) a summary and detail of accounts payable (*such Accounts and accounts payable divided into such time intervals as Lender may require in its sole discretion*), including a listing of any held checks; and (ii) within fifteen (*15*) days after the end of each month, the general ledger inventory account balance, a perpetual inventory report and Lender's standard form of Inventory report then in effect or the form most recently requested from the Borrowers by Lender, for each Obligor by each category of Inventory, together with a description of the monthly change in each category of Inventory.

Section 9.3     Financial Statements.  HCG shall deliver to Lender the following financial information, all of which shall be prepared in accordance with generally accepted accounting principles consistently applied, (i) no later than thirty (30) days after the end of each calendar month, copies of internally prepared financial statements of HCG and its Subsidiaries, on a consolidated basis, including, without limitation, balance sheets and statements of income, retained earnings and cash flow, certified by the Chief Financial Officer of HCG; (ii) no later than forty-five (45) days after the end of each of the first three Fiscal Quarters of each Fiscal Year, copies of the internally prepared financial statements of HCG and its subsidiaries, on a consolidated and consolidating basis, including, without limitation, balance sheets, statements of income, retained earnings, cash flows and reconciliation of surplus, certified by the Chief Financial Officer of HCG and (iii) no later than ninety (90) days after the end of each Fiscal Year, (A) audited annual financial statements of HCG and its Subsidiaries, on a consolidated and consolidating basis, with an unqualified opinion by independent certified public accountants selected by HCG and satisfactory to Lender and (B) copies of any management letters sent to HCG or any of its Subsidiaries by such accountants.

Section 9.4     Budget.  Commencing on January 12, 2012 and on the seventh Business Day after the first Business Day of each calendar month thereafter, Borrowers shall deliver to Lender, so as to actually be received by 5 p.m. (Chicago time) on each such seventh Business Day, a line-by-line variance report, in form and substance reasonably acceptable to Lender, for the immediately preceding calendar month (each such seventh Business Day, a "*Reporting Date*") and on a cumulative basis from the Petition Date to the Reporting Date, a detailed report that compares (i) actual cash receipts and actual cash disbursements to cash receipts and cash disbursements forecasted in the Budget for such period and showing on a line-

14

by-line basis any variance to the corresponding line-item of the Budget, together with an explanation for such variance.

Section 9.5     Prepetition Obligations Information and Notices.  Promptly upon providing to the Prepetition Secured Lender, copies of all information and notices delivered by any Obligor to the Prepetition Secured Lender as required by the Prepetition Credit Documents.

Section 9.6     Other Information.  Promptly following request therefore by Lender, such other business or financial data, reports, appraisals and projections.

## ARTICLE 10

## TERMINATION.

Upon the occurrence of the Termination Date for any reason whatsoever, (i) Lender shall not make any additional Loans or other extensions of credit, (ii) all Liabilities shall immediately due and payable, without any requirement of notice, demand or presentment, and (iii) this Agreement (other than those provisions hereof which expressly are intended to survive such date) shall terminate on the date thereafter that the Liabilities are indefeasibly paid in full in cash. At such time as Obligors have indefeasibly repaid all of the Liabilities in full in cash and this Agreement has terminated, Obligors shall deliver to Lender a release, in form and substance satisfactory to Lender, of all obligations and liabilities of Lender and its officers, directors, employees, agents, parents, subsidiaries and affiliates to Obligors created by, arising under or pursuant to this Agreement and the Other Agreements.

## ARTICLE 11

## REPRESENTATIONS AND WARRANTIES.

Each Obligor hereby represents and warrants to Lender, on behalf of itself and each of its Subsidiaries, which representations and warranties (*whether appearing in this Section 11 or elsewhere*) shall be true and correct at the time of such Obligor's execution hereof and the closing the transactions described herein or related hereto, shall remain true until repayment in full in cash and satisfaction of all the Liabilities and termination of this Agreement, and shall be deemed to have been remade by such Obligor at the time each Loan is made pursuant to this Agreement.

Section 11.1     Financial Statements and Other Information.  The financial statements and other information delivered or to be delivered by Borrowers to Lender at or prior to the date of this Agreement accurately reflect the financial condition of HCG and its Subsidiaries, and there has been no material adverse change in the financial condition, the operations or any other status of HCG and its Subsidiaries since the date of the financial statements delivered to Lender most recently prior to the date of this Agreement, other than events typically resulting from the filing of the Cases and which may reasonably be anticipated as a result of the Cases.  All written information now or heretofore furnished by or on behalf of any Obligor to Lender is true and correct as of the date with respect to which such information was furnished.

15

Section 11.2   <u>Locations</u>.  The office where each Obligor keeps its books, records and accounts (*or copies thereof*) concerning the Collateral, each Obligor's principal place of business and all of each Obligor's other places of business, locations of Collateral and post office boxes and locations of bank accounts are as set forth in <u>Schedule 11.2</u> and at other locations within the continental United States of which Lender has been advised by the applicable Obligor in accordance with Section 12.2(a).  The Collateral, including, without limitation, the Equipment (*except (x) any part thereof which an Obligor shall have advised Lender in writing consists of Collateral normally used in more than one state, (y) Equipment which is in transit or (z) Equipment in the possession of employees of the Obligors in the ordinary course of business in an aggregate amount not in excess of $10,000 at any time*) is kept, or, in the case of vehicles, based, only at the addresses set forth on <u>Schedule 11.2</u> and at other locations within the continental United States of which Lender has been advised by the applicable Obligor in accordance with Section 12.2(a).  No Obligor owns any real property.

Section 11.3   <u>Loans by Obligors</u>.  Except as set forth on <u>Schedule 11.9</u>, no Obligor has made any loans or advances to any Affiliate or other Person except for advances authorized hereunder to employees, officers and directors of an Obligor for travel and other expenses arising in the ordinary course of business.

Section 11.4   <u>Intentionally omitted</u>.

Section 11.5   <u>Liens</u>.  Each Obligor is the lawful owner of all Collateral pledged by it hereunder now purportedly owned or hereafter purportedly acquired by such Obligor, free from all liens, claims, security interests and encumbrances whatsoever, whether voluntarily or involuntarily created and whether or not perfected, other than the Permitted Liens.

Section 11.6   <u>Organization, Authority and No Conflict</u>.  Each Obligor is a corporation or limited liability company, duly organized or formed, validly existing and in good standing under the laws of its jurisdiction of organization or formation.  Each Obligor is duly qualified and in good standing in all states where the nature and extent of the business transacted by it or the ownership of its assets makes such qualification necessary.  Each Obligor has the right and power and is duly authorized and empowered to enter into, execute and deliver this Agreement and the Other Agreements to which it is a party and perform its obligations hereunder and thereunder.  Each Obligor's execution, delivery and performance of this Agreement and the Other Agreements to which it is a party does not conflict with, or constitute a default under, the provisions of its organizational documents or any statute, regulation, ordinance or rule of law, or any agreement, contract or other document which may now or hereafter be binding on such Obligor, and each Obligor's execution, delivery and performance of this Agreement and the Other Agreements to which it is a party do not require any consent or approval of, or registration or filing with, or any other action by any governmental authority and shall not result in the imposition of any lien or other encumbrance upon such Obligor's property under any existing indenture, mortgage, deed of trust, loan, credit agreement, or other agreement or instrument by which such Obligor or any of its property may be bound or affected except liens created by this Agreement and Other Agreements to which it is a party.

Section 11.7   <u>Litigation</u>.  Except as set forth on <u>Schedule 11.7</u> hereto, there are no actions or proceedings which are pending or to any Obligor's knowledge, threatened against

any Obligor, or against any Affiliate of any Obligor which might have a materially adverse effect on any Obligor, and each Obligor shall, promptly upon becoming aware of any such pending or threatened action or proceeding, give written notice thereof to Lender.  No Obligor has any Commercial Tort Claims other than those set forth on Exhibit A hereto, as Exhibit A may be amended from time to time.

Section 11.8    Compliance with Laws and Maintenance of Permits.  Each Obligor has obtained all governmental consents, franchises, certificates, licenses, authorizations, approvals and permits necessary for the conduct of its business.  Each Obligor is in compliance in all material respects with all applicable federal, state, local and foreign statutes, orders, regulations, rules and ordinances (*including, without limitation, Environmental Laws and statutes, orders, regulations, rules and ordinances relating to taxes, employer and employee contributions and similar items, securities, ERISA or employee health and safety*).

Section 11.9    Affiliate Transactions.  Except as set forth on Schedule 11.9 hereto or as permitted pursuant to Section 13.9 hereof, no Obligor is conducting, permitting or suffering to be conducted, transactions with any officer, director, employee or Affiliate of any Obligor.  All transactions described on Schedule 11.9, are for the purchase or sale of Inventory or services in the ordinary course of business pursuant to terms that are no less favorable to the applicable Obligor than the terms upon which such transactions would have been made had they been made to or with a Person that has no relationship with such Obligor.

Section 11.10    Names and Trade Names.  Each Obligor's legal name is set forth on the first page of this Agreement and no Obligor uses any trade names, assumed names, fictitious names or division names in the operation of its business, except as set forth on Schedule 11.10 hereto.

Section 11.11    Equipment.  Each Obligor has good and indefeasible and merchantable title to and ownership of all of its Equipment, subject to Permitted Liens.  No Equipment is a Fixture to real estate unless such real estate is owned by an Obligor and is subject to a mortgage in favor of Lender, or if such real estate is leased, is subject to a landlord's agreement in favor of Lender on terms acceptable to Lender, or an accession to other personal property unless such personal property is subject to a first priority lien in favor of Lender.

Section 11.12    Enforceability.  Each Obligor has duly executed and delivered this Agreement and each Other Agreement to which is a party, and this Agreement and each Other Agreement to which it is a party constitute the legal, valid and binding obligations of such Obligor and are enforceable against such Obligor in accordance with their respective terms.

Section 11.13    Intentionally omitted.

Section 11.14    Indebtedness.  Except as permitted by Section 13.2, no Obligor is not obligated (*directly or indirectly*) for any Indebtedness other than the Loans.

Section 11.15    Margin Security and Use of Proceeds.  No Obligor owns any margin securities, and none of the proceeds of the Loans hereunder shall be used for the purpose of purchasing or carrying any margin securities or for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase any margin securities or for any other

17

purpose not permitted by Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

Section 11.16    Subsidiaries and Affiliates.    Except as set forth on Schedule 11.16 hereto, no Obligor has any Subsidiaries or other Affiliates or divisions, nor is any Obligor engaged in any joint venture or partnership with any other Person.

Section 11.17    No Defaults.  No Obligor nor any other Person is in default under any contract, lease or commitment to which an Obligor is a party or by which it is bound, nor is there any dispute regarding any such contract, lease or commitment.

Section 11.18    Employee Matters.    There are no controversies pending or threatened between any Obligor and any of its employees, agents or independent contractors other than employee grievances arising in the ordinary course of business which would not, in the aggregate, have a Material Adverse Effect, and each Obligor is in compliance with all federal and state laws respecting employment and employment terms, conditions and practices.

Section 11.19    Intellectual Property.  Each Obligor owns or has the right to use all Intellectual Property necessary to conduct its business as now conducted.  Schedule 11.19 contains a complete and accurate list and full description of each item of Intellectual Property together with, in the case of registered Intellectual Property: the (i) applicable registration number; (ii) filing, registration, issue or application date; (iii) record owner; (iv) country; (v) title or description; and (vi) remaining life.  In addition, Schedule 11.19 identifies whether each item of Intellectual Property is owned by each Obligor or possessed and used by any Obligor under any license or other agreement.  The Intellectual Property constitutes valid and enforceable rights and does not infringe or conflict with the rights of any other Person.  There is neither pending, nor to such Obligor's knowledge, threatened, any action or proceedings contesting the validity or right of any Obligor to use any of the Intellectual Property, and no Obligor nor any of its Affiliates has received any notice of infringement upon or conflict with any asserted right of others nor, to such Obligor's knowledge, is there a basis for such a notice.  To such Obligor's knowledge, no Person is infringing upon its rights to the Intellectual Property.  Except as otherwise provided in Schedule 11.19, no Obligor has any obligation to compensate others for the use of any Intellectual Property.

Section 11.20    Environmental Matters.  No Obligor has generated, used, stored, treated, transported, manufactured, handled, produced or disposed of any Hazardous Materials, on or off its premises (*whether or not owned by it*) in any manner which at any time violates any Environmental Law or any license, permit, certificate, approval or similar authorization thereunder and the operations of each Obligor comply with all Environmental Laws and all licenses, permits, certificates, approvals and similar authorizations thereunder.  There has been no investigation, proceeding, complaint, order, directive, claim, citation or notice by any governmental authority or any other Person, nor is any pending or to such Obligor's knowledge threatened with respect to any non-compliance with or violation of the requirements of any Environmental Law by any Obligor or the release, spill or discharge, threatened or actual, of any Hazardous Materials or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials or any other environmental, health or safety matter, which affects any Obligor or its business, operations or assets or any properties

at which any Obligor has transported, stored or disposed of any Hazardous Materials. No Obligor has any liability (*contingent or otherwise*) in connection with a release, spill or discharge, threatened or actual, of any Hazardous Materials or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials.

Section 11.21   ERISA Matters. All welfare plans and benefit plans provided to the employees of each Obligor have been administered in compliance with and have at all times complied with, all requirements of law including all requirements of ERISA, and each benefit plan intended to qualify under section 401(a) of the Internal Revenue Code has at all times since its adoption been so qualified, and each trust which forms a part of any such plan has at all times since its adoption been tax-exempt under section 501(a) of the code. Each Obligor has paid and discharged all obligations and liabilities arising under ERISA of a character which, if unpaid or unperformed, might result in the imposition of a lien against any of its properties or assets, or would have a materially adverse effect on such Obligor.

Section 11.22   Disclosure. No representation or warranty of any Obligor made hereunder or in the Schedules or in any certificate, statement or other document delivered by or on behalf of any Obligor hereunder contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading. Each Obligor has disclosed in writing to Lender all information regarding each Obligor, its affiliates and their respective businesses which is known to such Obligor and would be relevant to a reasonable lender's decision whether or not to make the Loans to the Borrowers. Copies of all documents referred to herein or in the Schedules have been delivered or made available to Lender, are true, correct and complete copies thereof, and include all amendments, supplements or modifications thereto or waivers thereunder.

Section 11.23   Lockbox, Deposit, Checking and Other Accounts. Schedule 11.23 sets forth all lockbox, deposit, checking and other accounts of each Obligor and the financial institutions where each such account is maintained.

## ARTICLE 12

## AFFIRMATIVE COVENANTS.

Until payment and satisfaction in full in cash of all Liabilities and termination of this Agreement, unless Borrowers obtain Lender's prior written consent waiving or modifying any Obligor's covenants hereunder in any specific instance, each Obligor covenants and agrees as follows, on behalf of itself and its Subsidiaries:

Section 12.1   Maintenance of Records. Each Obligor shall at all times keep accurate and complete books, records and accounts with respect to all of such Obligor's business activities, in accordance with sound accounting practices and generally accepted accounting principles consistently applied, and shall keep such books, records and accounts, and any copies thereof, only at the addresses indicated for such purpose on Schedule 11.2.

Section 12.2   Notices. Each Obligor shall:

(a)   Locations.  Promptly (*but in no event less than ten (10) days prior to the occurrence thereof*) notify Lender of the proposed opening of a new place of business or new location of Collateral, the closing of any existing place of business or location of Collateral, any change of the location of such Obligor's books, records and accounts, the opening or closing of any post office box, the opening or closing of any bank account or, if any of the Collateral consists of Goods of a type normally used in more than one state, the use of any such Goods in any state other than a state in which such Obligor has previously advised Lender that such Goods will be used.

(b)   Intentionally omitted.

(c)   Litigation and Proceedings.  Promptly upon becoming aware thereof, notify Lender of any actions or proceedings which are pending or threatened against such Obligor or any of its Affiliates which might have a materially adverse effect on any Obligor or Affiliate and of any Commercial Tort Claims of such Obligor which may arise, which notice shall constitute such Obligor's authorization to amend Exhibit A to add such Commercial Tort Claim.

(d)   Names and Trade Names.  Notify Lender within ten *(10)* days of the change of its name or the use of any trade name, assumed name, fictitious name or division name not previously disclosed to Lender in writing.

(e)   ERISA Matters.  Immediately notify Lender of (x) the occurrence of any "reportable event" (*as defined in ERISA*) which might result in the termination by the Pension Benefit Guaranty Corporation (*the "PBGC"*) of any employee benefit plan (*"Plan"*) covering any officers or employees of any Obligor, any benefits of which are, or are required to be, guaranteed by the PBGC, (y) receipt of any notice from the PBGC of its intention to seek termination of any Plan or appointment of a trustee therefore or (z) its intention to terminate or withdraw from any Plan.

(f)   Environmental Matters.  Promptly notify Lender upon becoming aware of any investigation, proceeding, complaint, order, directive, claim, citation or notice with respect to any non-compliance with or violation of the requirements of any Environmental Law by any Obligor or the generation, use, storage, treatment, transportation, manufacture handling, production or disposal of any Hazardous Materials or any other environmental, health or safety matter which affects any Obligor or its business operations or assets or any properties at which any Obligor has transported, stored or disposed of any Hazardous Materials.

(g)   Default; Material adverse change.  Promptly advise Lender of any material adverse change in the business, property, assets, prospects, operations or condition, financial or otherwise, of any Obligor, the occurrence of any Event of

20

Default hereunder or the occurrence of any event which, if uncured, will become an Event of Default after notice or lapse of time (*or both*).

All of the foregoing notices shall be provided by such Obligor to Lender in writing as provided in Article 19 of this Agreement.

Section 12.3 <u>Compliance with Laws and Maintenance of Permits</u>. Each Obligor shall maintain all governmental consents, franchises, certificates, licenses, authorizations, approvals and permits, the lack of which would have a materially adverse effect on any Obligor and shall remain in compliance with all applicable federal, state, local and foreign statutes, orders, regulations, rules and ordinances (*including, without limitation, Environmental Laws and statutes, orders, regulations, rules and ordinances relating to taxes, employer and employee contributions and similar items, securities, ERISA or employee health and safety*). Following any determination by Lender that there is non-compliance, or any condition which requires any action by or on behalf of an Obligor in order to avoid non-compliance, with any Environmental Law, at Borrowers' expense cause an independent environmental engineer acceptable to Lender to conduct such tests of the relevant site(s) as are appropriate and prepare and deliver a report setting forth the results of such tests, a proposed plan for remediation and an estimate of the costs thereof.

Section 12.4 <u>Inspection and Audits</u>. Each Obligor shall permit Lender, or any Persons designated by it, to call at any of its places of business at any reasonable times, and, without hindrance or delay, to inspect the Collateral and to inspect, audit, check and make extracts from such Obligor's books, records, journals, orders, receipts and any correspondence and other data relating to such Obligor's business, the Collateral or any transactions between the parties hereto, and shall have the right to make such verification concerning such Obligor's business as Lender may consider reasonable under the circumstances. Each Obligor shall furnish to Lender such information relevant to Lender's rights under this Agreement and the Other Agreements as Lender shall at any time and from time to time request. Lender, through its officers, employees or agents shall have the right, at any time and from time to time, in Lender's name, to verify the validity, amount or any other matter relating to the Accounts of any Obligor, by mail, telephone, telecopy, electronic mail, or otherwise. Each Obligor authorizes Lender to discuss the affairs, finances and business of such Obligor with any officers, employees or directors of such Obligor or any of its Affiliates or the officers, employees or directors of such Obligor or any Affiliate, and to discuss the financial condition of HCG and its Subsidiaries with HCG's independent public accountants. Any such discussions shall be without liability to Lender or to HCG's independent public accountants. Borrowers shall pay to Lender all customary fees and all costs and out-of-pocket expenses incurred by Lender in the exercise of its rights hereunder, and all of such fees, costs and expenses shall constitute Liabilities hereunder, shall be payable on demand and until paid shall bear interest at the highest rate then applicable to Loans hereunder.

Section 12.5 <u>Insurance</u>. Each Obligor shall:

(a)     Keep the Collateral properly housed and insured for the full insurable value thereof against loss or damage by fire, theft, explosion, sprinklers, collision (*in the case of motor vehicles*) and such other risks as are

21

customarily insured against by Persons engaged in businesses similar to that of Obligors, with such companies, in such amounts, with such deductibles, and under policies in such form, as shall be satisfactory to Lender. Original (*or certified*) copies of such policies of insurance have been delivered to Lender, together with evidence of payment of all premiums therefore, and shall contain an endorsement, in form and substance acceptable to Lender, showing loss under such insurance policies payable to Lender. Such endorsement, or an independent instrument furnished to Lender, shall provide that the insurance company shall give Lender at least thirty (*30*) days written notice before any such policy of insurance is altered or canceled and that no act, whether willful or negligent, or default of any Obligor or any other Person shall affect the right of Lender to recover under such policy of insurance in case of loss or damage. In addition, each Obligor shall cause to be executed and delivered to Lender an assignment of proceeds of its business interruption insurance policies. Each Obligor hereby directs all insurers under all policies of insurance to pay all proceeds payable thereunder directly to Lender. Each Obligor irrevocably makes, constitutes and appoints Lender (*and all officers, employees or agents designated by Lender*) as such Obligor's true and lawful attorney (*and agent-in-fact*) for the purpose of making, settling and adjusting claims under such policies of insurance, endorsing the name of such Obligor on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance and making all determinations and decisions with respect to such policies of insurance.

(b)     Maintain, at its expense, such public liability and third party property damage insurance as is customary for Persons engaged in businesses similar to that of Obligors with such companies and in such amounts, with such deductibles and under policies in such form as shall be satisfactory to Lender and original (*or certified*) copies of such policies have been or shall be, within ninety (90) days after the Closing Date, delivered to Lender, together with evidence of payment of all premiums therefore; each such policy shall contain an endorsement showing Lender as additional insured thereunder and providing that the insurance company shall give Lender at least thirty (*30*) days written notice before any such policy shall be altered or canceled.

If any Obligor at any time or times hereafter shall fail to obtain or maintain any of the policies of insurance required above or to pay any premium relating thereto, then Lender, without waiving or releasing any obligation or default by such Obligor hereunder, may (*but shall be under no obligation to*) obtain and maintain such policies of insurance and pay such premiums and take such other actions with respect thereto as Lender deems advisable. Such insurance, if obtained by Lender, may, but need not, protect such Obligor's interests or pay any claim made by or against such Obligor with respect to the Collateral. Such insurance may be more expensive than the cost of insurance such Obligor may be able to obtain on its own and may be cancelled only upon such Obligor providing evidence that it has obtained the insurance as required above. All

22

sums disbursed by Lender in connection with any such actions, including, without limitation, court costs, expenses, other charges relating thereto and reasonable attorneys' fees, shall constitute the Loans hereunder, shall be payable on demand by Borrowers to Lender and, until paid, shall bear interest at the highest rate then applicable to Loans hereunder.

Section 12.6    Collateral.   Each Obligor shall keep the Collateral in good condition, repair and order and shall make all necessary repairs to the Equipment and replacements thereof so that the operating efficiency and the value thereof shall at all times be preserved and maintained. Each Obligor shall permit Lender to examine any of the Collateral at any time and wherever the Collateral may be located and, each Obligor shall, immediately upon request therefore by Lender, deliver to Lender any and all evidence of ownership of any of the Equipment including, without limitation, certificates of title and applications of title. Each Obligor shall, at the request of Lender, indicate on its records concerning the Collateral a notation, in form satisfactory to Lender, of the security interest of Lender hereunder.

Section 12.7    Use of Proceeds.   Each Obligor agrees that the proceeds of the Loans shall only be used to pay Liabilities and expenses of Obligors in the amounts set forth in the Budget; provided, that nothing in this Agreement shall in any way prejudice or prevent Lender from objecting, for any reason, to any requests, motions or applications made in the Bankruptcy Court, including any applications for interim or final allowances of compensation for services rendered or reimbursement of expenses incurred under clause (a) of Section 105, or Section 330 or 331 of the Bankruptcy Code, by any party in interest; provided, further, that no Obligor shall use the proceeds of the Loans for any purpose that is prohibited by the Order.

Section 12.8    Taxes.   Each Obligor shall file all required tax returns and pay all of their taxes when due, including, without limitation, taxes imposed by federal, state or municipal agencies, and shall cause any liens for taxes to be promptly released; provided, that each Obligor shall have the right to contest the payment of such taxes in good faith by appropriate proceedings so long as (i) the amount so contested is shown on Obligors' financial statements; (ii) the contesting of any such payment does not give rise to a lien for taxes; (iii) keep on deposit with Lender (*such deposit to be held without interest*) an amount of money which, in the judgment of Lender, is sufficient to pay such taxes and any interest or penalties that may accrue thereon; and (iv) if such Obligor fails to prosecute such contest with reasonable diligence, Lender may apply the money so deposited in payment of such taxes. If any Obligor fails to pay any such tax that is senior in priority to the Liabilities or the Prepetition Senior Lender Liens, and in the absence of any contest by such Obligor, following five (5) Business Days' written notice to Obligors and counsel for the Committee, Lender may (*but shall be under no obligation to*) advance and pay any sums required to pay any such taxes and/or to secure the release of any lien therefore, and any sums so advanced by Lender shall constitute Loans hereunder, shall be payable by Borrowers to Lender on demand, and, until paid, shall bear interest at the highest rate then applicable to the Loans.

Section 12.9    Intellectual Property.   Each Obligor shall maintain and have the right to use all Intellectual Property used in or necessary for the conduct of its business as heretofore conducted by it.

23

Section 12.10   <u>Lockbox, Deposit, Checking and Other Accounts</u>. Each Obligor shall maintain all of its lockbox, deposit, checking and other accounts at banks acceptable to Lender, in its sole discretion.

## ARTICLE 13

## NEGATIVE COVENANTS.

Until payment and satisfaction in full in cash of all Liabilities and termination of this Agreement, unless Borrowers obtain Lender's prior written consent waiving or modifying any Obligor's covenants hereunder in any specific instance, each Obligor agrees as follows, on behalf of itself and its Subsidiaries:

Section 13.1   <u>Guaranties</u>. No Obligor shall assume, guarantee or endorse, or otherwise become liable in connection with, the obligations of any Person, except (i) by endorsement of instruments for deposit or collection or similar transactions in the ordinary course of business; or (ii) each Borrower may guaranty the Liabilities of each other Borrower.

Section 13.2   <u>Indebtedness</u>. No Obligor shall create, incur, assume or become obligated (*directly or indirectly*), for any Indebtedness, other than: (i) the Liabilities; (ii) the Prepetition Obligations; (iii) the Indebtedness of HCG to MRR evidenced by the MRR Note in an outstanding principal amount not to exceed $1,166,388.89; and (iv) the Indebtedness of Hartford to HCG Financial evidenced by the PO Note in an outstanding principal amount not to exceed $869,000.

Section 13.3   <u>Liens</u>. No Obligor shall grant or permit to exist (*voluntarily or involuntarily*) any lien, claim, security interest or other encumbrance whatsoever on any of its assets, other than Permitted Liens. Without limiting the foregoing, no Obligor shall directly or indirectly create, incur or suffer to exist any mortgage, deed of trust, pledge, lien, security interest or charge or convey any real property owned by it to any Person, or grant any leasehold interests therein.

Section 13.4   <u>Mergers, Sales, Acquisitions, Subsidiaries and Other Transactions Outside the Ordinary Course of Business</u>. No Obligor shall: (i) enter into any merger or consolidation; (ii) change the state of such Obligor's organization or enter into any transaction which has the effect of changing such Obligor's state of organization; (iii) sell, lease or otherwise dispose of any assets other than (x) Permitted Dispositions and (y) the Sale so long as the proceeds thereof are used for the payment in full in cash of all Liabilities; (iv) purchase the stock, other equity interests or all or a material portion of the assets of any Person or division of such Person; or (v) enter into any other transaction outside the ordinary course of business, including, without limitation, any purchase, redemption or retirement of any shares of any class of its stock or any other equity interest, and any issuance of any shares of, or warrants or other rights to receive or purchase any shares of, any class of its stock or any other equity interest. No Obligor shall enter into any joint ventures or partnerships with any other Person or form or acquire any Subsidiary.

Section 13.5    <u>Dividends and Distributions</u>.  No Obligor shall declare or pay any dividend or make any other distribution (*whether in cash or in kind*) on any class of its equity or in any other manner to any holder of its Capital Stock, except that any Subsidiary of HCG may make dividends or other distributions (*whether in cash or in kind*) to HCG.

Section 13.6    <u>Investments; Loans</u>.  No Obligor shall (i) purchase or otherwise acquire, or contract to purchase or otherwise acquire, the obligations or stock of any Person, other than direct obligations of the United States; (ii) lend or otherwise advance funds to any Person except for advances made to employees, officers and directors for travel and other expenses arising in the ordinary course of business; or (iii) enter into any joint ventures or partnership with any other Person or form or acquire any Subsidiary.

Section 13.7    <u>Fundamental Changes, Line of Business</u>.  No Obligor shall (i) amend its organizational documents; (ii) change its Fiscal Year; or (iii) enter into new lines of business materially different from Obligors' current business.

Section 13.8    <u>Equipment</u>.  No Obligor shall (i) permit any Equipment to become a Fixture to real property unless such real property is owned by an Obligor and is subject to a mortgage in favor of Lender; or (ii) permit any Equipment to become an accession to any other personal property unless such personal property is subject to a first priority lien in favor of Lender.

Section 13.9    <u>Affiliate Transactions</u>.  Except as set forth on <u>Schedule 11.9</u> hereto or as permitted pursuant to Section 11.3 hereof, no Obligor shall conduct, permit or suffer to be conducted, transactions with any officer, director, employee or Affiliate of any Obligor (each, an "*Affiliate Party*"), other than transactions for the purchase or sale of Inventory or services in the ordinary course of business pursuant to terms that are no less favorable to such Obligor than the terms upon which such transactions would have been made had they been made to or with a Person that is not an Affiliate Party.

Section 13.10    <u>Settling of Accounts</u>.  No Obligor shall not settle or adjust any Account except in the ordinary course of business.

Section 13.11    <u>Management Fees; Compensation</u>.  No Obligor shall pay any management or consulting fees to any Persons; <u>provided</u>, that Borrowers may pay reasonable fees to other consultants in connection with the Cases and/or a Sale to the extent, and only to the extent, set forth in the Budget.

Section 13.12    <u>Restriction on Amendment to Certain Documents</u>.  No Obligor shall amend or otherwise modify, or waive any rights under, without the consent of Lender, the MRR Note or the PO Note.

Section 13.13    <u>Prepayment of Certain Indebtedness</u>.  No Obligor shall, directly or indirectly, voluntarily purchase, redeem, defease or prepay any principal of, premium, if any, interest or other amount payable in respect of any Indebtedness prior to its scheduled maturity, other than (i) the Liabilities, and (ii) as set forth in the Order, the Prepetition Obligations.

Section 13.14   The Order.  No Obligor shall make or permit to be made any change, amendment or modification, or any application or motion for any change, amendment or modification, to any Order without the prior written consent of the Lender.

Section 13.15   The Budget.  No Obligor shall make or permit to be made (i) any change, amendment or modification to the Budget without the prior written consent of Lender and the Prepetition Secured Lender, or (ii) any payment or disbursement other than the itemized projected disbursements set forth in the Budget without the prior written consent of Lender and the Prepetition Secured Lender.

## ARTICLE 14

## FINANCIAL COVENANTS.

Obligors shall maintain and keep in full force and effect each of the financial covenants set forth below.

Section 14.1   Budget.  No Obligor shall permit (a) the aggregate actual disbursements by the Obligors from the Petition Date to any Reporting Date to be greater than 110% of the aggregate amount of projected disbursements for such period as set forth in the Budget, and (b) the aggregate actual cash receipts collected by the Obligors from the Petition Date to any Reporting Date to be less than 90% of the aggregate amount of projected cash receipts for such period as set forth in the Budget.

## ARTICLE 15

## DEFAULT.

The occurrence of any one or more of the following events shall constitute an "Event of Default" by Obligors hereunder:

Section 15.1   Payment.  The failure of any Obligor to pay when due, declared due, or demanded by Lender, any of the Liabilities or the Prepetition Obligations within three (3) days after such payment is due, declared due or demanded.

Section 15.2   Breach of this Agreement and the Other Agreements.  The failure of any Obligor to perform, keep or observe any of the covenants, conditions, promises, agreements or obligations of such Obligor (a) in Sections 9.2, 9.3, 9.4, 12.2, 12.5, 12.7 or 12.10 or Articles 13 or 14 of this Agreement, or (b) under this Agreement or any of the Other Agreements (other than those referenced in Section 15.1 and 15.2(a) above) and such failure is not cured in full within fifteen (15) Business Days after the earlier to occur of (x) an officer of any Obligor obtaining knowledge of such failure or (y) the Obligors receiving written notice of such failure from Lender.

Section 15.3   Breaches of Other Obligations.  The failure of any Obligor to perform, keep or observe any of the covenants, conditions, promises, agreements or obligations of such Obligor under any other agreement with any Person if such failure might have a Material Adverse Effect on such Obligor.

26

Section 15.4    Breach of Representations and Warranties.    The making or furnishing by any Obligor to Lender of any representation, warranty, certificate, schedule, report or other communication within or in connection with this Agreement or the Other Agreements or in connection with any other agreement between or among Obligors, which is untrue or misleading in any material respect.

Section 15.5    Loss of Collateral.    The loss, theft, damage or destruction of, or (*except as permitted hereby*) sale, lease or furnishing under a contract of service of, any of the Collateral in an aggregate amount in excess of $50,000 during the term of this Agreement.

Section 15.6    Levy, Seizure or Attachment.    The making or any attempt by any Person to make any levy, seizure or attachment upon any of the Collateral in an aggregate amount in excess of $50,000 during the term of this Agreement.

Section 15.7    Judgment.    The entry of any judgment or order against any Obligor in an aggregate amount in excess of $50,000 which remains unsatisfied or undischarged and in effect for thirty (*30*) days after such entry without a stay of enforcement or execution.

Section 15.8    Dissolution of Obligor; Cessation of Business.    (i) Any cessation of a substantial part of the business of any Obligor for a period which materially and adversely affects such Obligor; or (ii) the dissolution of any Obligor.

Section 15.9    Default or Revocation of Guaranty.    The occurrence of an event of default under or the revocation or termination of, any agreement, instrument or document executed and delivered by any Person to Lender pursuant to which such Person has guaranteed to Lender the payment of all or any of the Liabilities or has granted Lender a security interest in or lien upon some or all of such Person's real and/or personal property to secure the payment of all or any of the Liabilities.

Section 15.10    Criminal Proceedings.    The institution in any court of a criminal proceeding against any Obligor, or the indictment of any Obligor for any crime.

Section 15.11    Material Adverse Change.    The occurrence of any event or circumstance that would have a Material Adverse Effect.

Section 15.12    This Agreement, Other Agreements and Orders.    This Agreement or any Other Agreement or the Orders shall, for any reason, cease to create a valid lien on any of the Collateral purported to be covered thereby or such Lien shall cease to be a perfected Lien having the priority provided pursuant to the Order and Section 364 of the Bankruptcy Code against each Obligor, or any Obligor shall so allege in any pleading in any court or any material provision of this Agreement or any Other Agreement shall, for any reason, cease to be valid and binding on each Obligor which is a party thereto or any Obligor shall so state in writing.

Section 15.13    Order Defaults.    The occurrence of any "Event of Default" (as such term is defined in the Order).

## ARTICLE 16

## REMEDIES UPON AN EVENT OF DEFAULT.

(A)    Upon the occurrence and during the continuance of any Event of Default, all Liabilities may, at the option of Lender, and without demand, notice or legal process of any kind, be declared, and immediately shall become, due and payable.

(B)    Upon the occurrence and during the continuance of an Event of Default, Lender may exercise from time to time any rights and remedies available to it under the Uniform Commercial Code and any other applicable law in addition to, and not in lieu of, any rights and remedies expressly granted in this Agreement or in any of the Other Agreements and all of Lender's rights and remedies shall be cumulative and non-exclusive to the extent permitted by law.  In particular, but not by way of limitation of the foregoing, Lender may, without notice, demand or legal process of any kind, take possession of any or all of the Collateral *(in addition to Collateral of which it already has possession)*, wherever it may be found, and for that purpose may pursue the same wherever it may be found, and may enter onto any premises of any Obligor where any of the Collateral may be, and search for, take possession of, remove, keep and store any of the Collateral until the same shall be sold or otherwise disposed of, and Lender shall have the right to store the same at any premises of any Obligor without cost to Lender.  At Lender's request, Obligors shall, at their own expense, assemble the Collateral and make it available to Lender at one or more places to be designated by Lender and reasonably convenient to Lender and Obligors. Each Obligor recognizes that if it fails to perform, observe or discharge any of its Liabilities under this Agreement or the Other Agreements, no remedy at law will provide adequate relief to Lender, and agrees that Lender shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages.   Any notification of intended disposition of any of the Collateral required by law will be deemed to be a reasonable authenticated notification of disposition if given at least ten (*10*) days prior to such disposition and such notice shall:  (i) describe Lender and the applicable Obligor, (ii) describe the Collateral that is the subject of the intended disposition, (iii) state the method of the intended disposition, (iv) state that such Obligor is entitled to an accounting of the Liabilities and state the charge, if any, for an accounting and (v) state the time and place of any public disposition or the time after which any private sale is to be made.  Lender may disclaim any warranties that might arise in connection with the sale, lease or other disposition of the Collateral and has no obligation to provide any warranties at such time.  Any Proceeds of any disposition by Lender of any of the Collateral may be applied by Lender to the payment of expenses in connection with the Collateral, including, without limitation, legal expenses and reasonable attorneys' fees, and any balance of such Proceeds may be applied by Lender toward the payment of such of the Liabilities, and in such order of application, as Lender may from time to time elect.

## ARTICLE 17

## CONDITIONS PRECEDENT.

17.1    Closing Date.  The obligation of Lender to enter into this Agreement is subject to the satisfaction (or waiver by Lender in its sole and absolute discretion) on or before the Closing Date of the following conditions precedent:

28

(A)    Lender shall have received this Agreement and each Other Agreement executed and delivered by each applicable Obligor, including, without limitation, each of the agreements, opinions, reports, approvals, consents, certificates and other documents set forth on the closing document list attached hereto as Exhibit B (*the "Closing Document List"*), in each case in form and substance satisfactory to Lender;

(B)    Lender shall have received the Budget, prepared in accordance with the Order and in such detail and in form and substance satisfactory to the Lender;

(C)    The Bankruptcy Court shall have entered the Interim Financing Order, in form and substance satisfactory to the Lender, and the Lender shall have received a certified copy of such Order. The Interim Financing Order shall be in full force and effect and shall not have been vacated, reversed, modified or stayed in any respect and, if such order is the subject of any pending appeal, no performance of any obligation of any party hereto shall have been stayed pending such appeal;

(D)    Lender shall have received a copy of all First Day Orders, which shall be in form and substance satisfactory to the Lender;

(E)    Lender shall be satisfied that it has been granted, and holds, a perfected Lien on, and security interest in, all of the Collateral of each Obligor, subject only to the Carve-Out;

(F)    Since September 30, 2011, no event shall have occurred which has had or could have a Material Adverse Effect on any Obligor, as determined by Lender in its sole discretion;

(G)    Lender shall have received payment in full of all fees and expenses payable to it by Obligors or any other Person in connection herewith; and

(H)    The Obligors shall have executed and delivered to Lender all such other documents, instruments and agreements which Lender determines are reasonably necessary to consummate the transactions contemplated hereby.

17.2    Conditions to each Loan. The obligation of the Lenders to fund any Loan is subject to the satisfaction (or waiver by Lender in its sole and absolute discretion) of the following conditions precedent:

(A)    As of the Borrowing Date, the representations and warranties contain in this Agreement and each Other Agreement shall be true and correct in all material respects (or in the case of any representation and warranty qualified by materiality or "Material Adverse Effect", true and correct in all respects) on and as of such Borrowing Date to the same extent as though made on and as of that date, except to the extent any such representation and warranty specifically relates to an earlier date, in which case such representation and warranty shall have been true and correct in all material respects (or in the case of any representation and warranty qualified by materiality or "Material Adverse Effect", true and correct in all respects) on and as of such earlier date; and

(B)    As of the Borrowing Date, no Event of Default or any event which, if uncured, will become an Event of Default after notice or lapse of time (*or both*) shall have occurred.

29

## ARTICLE 18

## INDEMNIFICATION.

Each Obligor agrees to defend (*with counsel satisfactory to Lender*), protect, indemnify and hold harmless Lender, each affiliate or subsidiary of Lender, and each of their respective officers, directors, employees, attorneys and agents (*each an "Indemnified Party"*) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature (*including, without limitation, the disbursements and the reasonable fees of counsel for each Indemnified Party in connection with any investigative, administrative or judicial proceeding, whether or not the Indemnified Party shall be designated a party thereto*), which may be imposed on, incurred by, or asserted against, any Indemnified Party (*whether direct, indirect or consequential and whether based on any federal, state or local laws or regulations, including, without limitation, securities laws and regulations, Environmental Laws and commercial laws and regulations, under common law or in equity, or based on contract or otherwise*) in any manner relating to or arising out of this Agreement or any Other Agreement, or any act, event or transaction related or attendant thereto, the making or issuance and the management of the Loans or the use or intended use of the proceeds of the Loans; provided, however, that Obligors shall not have any obligation hereunder to any Indemnified Party with respect to matters caused by or resulting from the willful misconduct or gross negligence of such Indemnified Party, as determined by a final, non-appealable judgment by a court of competent jurisdiction. To the extent that the undertaking to indemnify set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, Obligors shall satisfy such undertaking to the maximum extent permitted by applicable law. Any liability, obligation, loss, damage, penalty, cost or expense covered by this indemnity shall be paid to each Indemnified Party on demand, and, failing prompt payment, shall, together with interest thereon at the highest rate then applicable to Loans hereunder from the date incurred by each Indemnified Party until paid by Obligors, be added to the Liabilities of Obligors and be secured by the Collateral. The provisions of this Section 18 shall survive the satisfaction and payment of the other Liabilities and the termination of this Agreement.

## ARTICLE 19

## NOTICE.

All written notices and other written communications with respect to this Agreement shall be sent by ordinary, certified or overnight mail, by telecopy or electronic communication or delivered in person, and in the case of Lender shall be sent to it at 900 North Michigan Avenue, Suite 1900, Chicago, Illinois 60611, attention: Prashant Gupta, facsimile number: 312-915-2487, e-mail: gupta@dsc, and in the case of counsel to the Committee shall be sent to it at Levenfeld Pearlstein, LLC, 2 North LaSalle Street, Suite 1300, Chicago, Illinois 60602, attention Steven R. Jakubowski, facsimile number: 312-346-8434, e-mail: sjakubowski@lplegal.com, and in the case of each Obligor shall be sent to such Obligor at its principal place of business set forth on Schedule 11.2 hereto or as other directed by such Obligor in writing. All notices shall be deemed received upon actual receipt thereof or refusal of delivery.

30

## ARTICLE 20

### CHOICE OF GOVERNING LAW; CONSTRUCTION; FORUM SELECTION.

This Agreement and the Other Agreements are submitted by Obligors to Lender for Lender's acceptance or rejection at Lender's principal place of business as an offer by Borrowers to borrow monies from Lender now and from time to time hereafter, and shall not be binding upon Lender or become effective until accepted by Lender, in writing, at said place of business. If so accepted by Lender, this Agreement and the Other Agreements shall be deemed to have been made at said place of business. THIS AGREEMENT AND THE OTHER AGREEMENTS SHALL BE GOVERNED AND CONTROLLED BY THE INTERNAL LAWS OF THE STATE OF ILLINOIS AS TO INTERPRETATION, ENFORCEMENT, VALIDITY, CONSTRUCTION, EFFECT, AND IN ALL OTHER RESPECTS, INCLUDING, WITHOUT LIMITATION, THE LEGALITY OF THE INTEREST RATE AND OTHER CHARGES, BUT EXCLUDING PERFECTION OF THE SECURITY INTERESTS IN COLLATERAL LOCATED OUTSIDE OF THE STATE OF ILLINOIS, WHICH SHALL BE GOVERNED BY THE LAWS OF THE RELEVANT JURISDICTION IN WHICH SUCH COLLATERAL IS LOCATED. If any provision of this Agreement shall be held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or remaining provisions of this Agreement.

To induce Lender to accept this Agreement, each Obligor irrevocably agrees that, subject to Lender's sole and absolute election, ALL ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT, ARISING OUT OF OR FROM OR RELATED TO THIS AGREEMENT, THE OTHER AGREEMENTS OR THE COLLATERAL SHALL BE LITIGATED, AT LENDER'S SOLE ELECTION, IN COURTS HAVING SITUS WITHIN THE CITY OF CHICAGO, STATE OF ILLINOIS. EACH OBLIGOR HEREBY CONSENTS AND SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURTS LOCATED WITHIN SAID CITY AND STATE. EACH OBLIGOR HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON SUCH OBLIGOR BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO SUCH OBLIGOR, AT THE ADDRESS SET FORTH FOR NOTICE IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED. EACH OBLIGOR HEREBY WAIVES ANY RIGHT IT MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST SUCH OBLIGOR BY LENDER IN ACCORDANCE WITH THIS SECTION.

## ARTICLE 21

### MODIFICATION AND BENEFIT OF AGREEMENT.

This Agreement and the Other Agreements may not be modified, altered or amended except by an agreement in writing signed by each Obligor or such other Person who is a party to such Other Agreement and Lender. No Obligor may sell, assign or transfer this Agreement, or the Other Agreements or any portion thereof, including, without limitation, such

Obligor's rights, titles, interest, remedies, powers or duties hereunder and thereunder. Each Obligor hereby consent to Lender's sale, assignment, transfer or other disposition, at any time and from time to time hereafter, of this Agreement, or the Other Agreements, or of any portion thereof, or participations therein, including, without limitation, Lender's rights, titles, interest, remedies, powers and/or duties and agrees that it shall execute and deliver such documents as Lender may request in connection with any such sale, assignment, transfer or other disposition.

## ARTICLE 22

## HEADINGS OF SUBDIVISIONS.

The headings of subdivisions in this Agreement are for convenience of reference only, and shall not govern the interpretation of any of the provisions of this Agreement.

## ARTICLE 23

## POWER OF ATTORNEY.

Each Obligor acknowledges and agrees that its appointment of Lender as its attorney and agent-in-fact for the purposes specified in this Agreement is an appointment coupled with an interest and shall be irrevocable until all of the Liabilities are satisfied and paid in full and this Agreement is terminated.

## ARTICLE 24

## CONFIDENTIALITY.

Lender hereby agrees to use commercially reasonable efforts to assure that any and all information relating to any Obligor which is (i) furnished by an Obligor to Lender (*or to any affiliate of Lender*); and (ii) non-public, confidential or proprietary in nature, shall be kept confidential by Lender or such affiliate as required by applicable law; provided, however, that such information and other credit information relating to any Obligor may in connection with Lender's customary internal marketing practices be distributed by Lender or such affiliate to the Committee or to Lender's or such affiliate's directors, officers, employees, attorneys, affiliates, assignees, participants, auditors, agents and regulators, and upon the order of a court or other governmental agency having jurisdiction over Lender or such affiliate, to any other Person. Obligors and Lender further agree that this provision shall survive the termination of this Agreement.

## ARTICLE 25

## COUNTERPARTS.

This Agreement, any of the Other Agreements, and any amendments, waivers, consents or supplements may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which, when so executed and delivered, shall be deemed an original, but all of which counterparts together shall constitute but one agreement.

## ARTICLE 26

### CONFLICT OF TERMS.

Except as otherwise provided in this Agreement or any Other Agreement by specific reference to the applicable provisions of this Agreement, if any provision of this Agreement conflicts with any provision of the Other Agreements, the provisions of this Agreement shall govern and control, and if any provisions contained in this Agreement or any Other Agreement conflicts with any provision in the Order, the provision in the Order shall govern and control.

## ARTICLE 27

### WAIVER OF JURY TRIAL; OTHER WAIVERS.

(A)    OBLIGORS AND LENDER EACH HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING WHICH PERTAINS DIRECTLY OR INDIRECTLY TO THIS AGREEMENT, ANY OF THE OTHER AGREEMENTS, THE LIABILITIES, THE COLLATERAL OR ANY ALLEGED TORTIOUS CONDUCT BY ANY OBLIGOR OR LENDER OR WHICH, IN ANY WAY, DIRECTLY OR INDIRECTLY, ARISES OUT OF OR RELATES TO THE RELATIONSHIP BETWEEN OBLIGORS AND LENDER IN RESPECT OF THIS AGREEMENT OR THE OTHER AGREEMENTS. IN NO EVENT SHALL LENDER BE LIABLE FOR LOST PROFITS OR OTHER SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES.

(B)    Each Obligor hereby waives demand, presentment, protest and notice of nonpayment, and further waives the benefit of all valuation, appraisal and exemption laws.

(C)    Each Obligor hereby waives the benefit of any law that would otherwise restrict or limit Lender or any affiliate of Lender in the exercise of its right, which is hereby acknowledged and agreed to, to set-off against the Liabilities, without notice at any time hereafter, any indebtedness, matured or unmatured, owing by Lender or such affiliate of Lender to such Obligor, including, without limitation any deposit account at Lender or such affiliate.

(D)    EACH OBLIGOR HEREBY WAIVES ALL RIGHTS TO NOTICE AND HEARING OF ANY KIND PRIOR TO THE EXERCISE BY LENDER OF ITS RIGHTS TO REPOSSESS THE COLLATERAL OF SUCH BORROWER WITHOUT JUDICIAL PROCESS OR TO REPLEVY, ATTACH OR LEVY UPON SUCH COLLATERAL.

Lender's failure, at any time or times hereafter, to require strict performance by Obligors (or any of them) of any provision of this Agreement or any of the Other Agreements shall not waive, affect or diminish any right of Lender thereafter to demand strict compliance and performance therewith. Any suspension or waiver by Lender of an Event of Default under this Agreement or any default under any of the Other Agreements shall not suspend, waive or affect any other Event of Default under this Agreement or any other default under any of the Other Agreements, whether the same is prior or subsequent thereto and whether of the same or of a different kind or character. No delay on the part of Lender in the exercise of any right or remedy

under this Agreement or any Other Agreement shall preclude other or further exercise thereof or the exercise of any right or remedy. None of the undertakings, agreements, warranties, covenants and representations of Obligors contained in this Agreement or any of the Other Agreements and no Event of Default under this Agreement or default under any of the Other Agreements shall be deemed to have been suspended or waived by Lender unless such suspension or waiver is in writing, signed by a duly authorized officer of Lender and directed to Obligors specifying such suspension or waiver.

## ARTICLE 28

## JOINT AND SEVERAL LIABILITY.

Notwithstanding anything to the contrary contained herein, all Liabilities shall be joint and several obligations of all Borrowers.

(A)     Each Borrower assumes responsibility for keeping itself informed of the financial condition of the each other Borrower, and any and all endorsers and/or guarantors of any instrument or document evidencing all or any part of such other Borrower's Liabilities and of all other circumstances bearing upon the risk of nonpayment by such other Borrower of its Liabilities and each Borrower agrees that Lender shall not have any duty to advise such Borrower of information known to Lender regarding such condition or any such circumstances or to undertake any investigation not a part of its regular business routine. If Lender, in its sole discretion, undertakes at any time or from time to time to provide any such information to a Borrower, Lender shall not be under any obligation to update any such information or to provide any such information to such Borrower on any subsequent occasion.

(C)     Lender is hereby authorized, without notice or demand and without affecting the liability of any Borrower hereunder, to, at any time and from time to time, (i) renew, extend, accelerate or otherwise change the time for payment of, or other terms relating to a Borrower's Liabilities or otherwise modify, amend or change the terms of any promissory note or other agreement, document or instrument now or hereafter executed by a Borrower and delivered to Lender; (ii) accept partial payments on a Borrower's Liabilities; (iii) take and hold security or collateral for the payment of a Borrower's Liabilities hereunder or for the payment of any guaranties of a Borrower's Liabilities or other liabilities of a Borrower and exchange, enforce, waive and release any such security or collateral; (iv) apply such security or collateral and direct the order or manner of sale thereof as Lender, in its sole discretion, may determine; and (v) settle, release, compromise, collect or otherwise liquidate a Borrower's Liabilities and any security or collateral therefor in any manner, without affecting or impairing the obligations of the other Borrowers. Lender shall have the exclusive right to determine the time and manner of application of any payments or credits, whether received from a Borrower or any other source, and such determination shall be binding on such Borrower. All such payments and credits may be applied, reversed and reapplied, in whole or in part, to any of a Borrower's Liabilities as Lender shall determine in its sole discretion without affecting the validity or enforceability of the Liabilities of the other Borrowers.

(D)     Each Borrower hereby agrees that, except as hereinafter provided, its obligations hereunder shall be unconditional, irrespective of (i) the absence of any attempt to collect a

34

Borrower's Liabilities from any Borrower or any guarantor or other action to enforce the same; (ii) the waiver or consent by Lender with respect to any provision of any instrument evidencing Borrowers' Liabilities, or any part thereof, or any other agreement heretofore, now or hereafter executed by a Borrower and delivered to Lender; (iii) failure by Lender to take any steps to perfect and maintain its security interest in, or to preserve its rights to, any security or collateral for Borrowers' Liabilities; or (iv) any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor.

(E)     No payment made by or for the account of a Borrower including, without limitations, (i) a payment made by such Borrower on behalf of another Borrower's Liabilities or (ii) a payment made by any other person under any guaranty, shall entitle such Borrower, by subrogation or otherwise, to any payment from such other Borrower or from or out of such other Borrower's property and such Borrower shall not exercise any right or remedy against such other Borrower or any property of such other Borrower by reason of any performance of such Borrower of its joint and several obligations hereunder.

[SIGNATURE PAGES TO FOLLOW]

35

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement as of the date first written above.

**BORROWERS:**

**HARTFORD COMPUTER GROUP, INC.**,
a Delaware corporation


By:_____
Name:
Title:


**NEXICORE SERVICES, LLC**,
a Delaware limited liability company


By:_____
Name:
Title:


**HARTFORD COMPUTER HARDWARE, INC.**,
an Illinois corporation


By:_____
Name:
Title:


**HARTFORD COMPUTER GOVERNMENT, INC.**, an Illinois corporation


By:_____
Name:
Title:

**LENDER:**

**DELAWARE STREET CAPITAL MASTER
FUND, L.P.**, a Cayman Islands exempt limited
partnership


By:_____
Name:
Title:

** PRIVILEGED AND CONFIDENTIAL **

HARTFORD COMPUTER GROUP, DIP BUDGET

| | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Dec-May Total |
|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | 5,900,000 | 5,900,000 | 6,850,000 | 8,100,000 | 5,900,000 | 6,700,000 | 5,800,000 | 5,500,000 | 38,850,000 |
| **Collections** | | 5,605,000 | 5,605,000 | 6,507,500 | 7,695,000 | 5,605,000 | 6,365,000 | 5,510,000 | 37,287,500 |
| **Disbursements** | | | | | | | | | |
| Payroll | | | 2,373,500 | 2,480,000 | 2,228,000 | 1,957,000 | 1,916,000 | 1,880,000 | 12,834,500 |
| COGS- Materials | | | 2,861,500 | 3,322,250 | 3,928,500 | 2,861,500 | 3,249,500 | 2,813,000 | 19,036,250 |
| COGS - Freight | | | 413,000 | 479,500 | 567,000 | 413,000 | 469,000 | 406,000 | 2,747,500 |
| COGS - Other | | | 230,000 | 230,000 | 230,000 | 230,000 | 230,000 | 230,000 | 1,380,000 |
| SG&A - Contract labor | | | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 660,000 |
| SG&A - Rent | | | 120,000 | 110,000 | 110,000 | 110,000 | 110,000 | 110,000 | 660,000 |
| SG&A - Other | | | 325,000 | 325,000 | 325,000 | 90,000 | 90,000 | 90,000 | 610,000 |
| Noncurring payments | | | 1,850,000 | 225,000 | 100,000 | 325,000 | 325,000 | 325,000 | 1,950,000 |
| Sony LC | | | 750,000 | | | | | | 750,000 |
| Professional fees | | | | 409,000 | 428,000 | 458,000 | 511,000 | 380,000 | 2,186,000 |
| DSC Interest | | | 8,750 | 8,750 | 55,000 | 55,000 | 55,000 | 55,000 | 237,500 |
| Total Disbursements | | | 9,041,750 | 7,699,500 | 8,081,500 | 6,499,500 | 6,955,500 | 6,289,000 | 44,566,750 |
| **Change in Cash** | | | (3,436,750) | (1,192,000) | (386,500) | (894,500) | (590,500) | (779,000) | (7,279,250) |

**Working Capital**

| | | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Dec-May Total |
|---|---|---|---|---|---|---|---|---|---|---|
| AR | opening balance | | 8,700,000 | 8,700,000 | 9,945,000 | 11,537,500 | 9,742,500 | 10,837,500 | 10,272,500 | 8,700,000 |
| | plus revenue | | | 6,850,000 | 8,100,000 | 5,900,000 | 6,700,000 | 5,800,000 | 5,500,000 | 38,850,000 |
| | less collections | | | 5,605,000 | 6,507,500 | 7,695,000 | 5,605,000 | 6,365,000 | 5,510,000 | 37,287,500 |
| | closing balance | | | 9,945,000 | 11,537,500 | 9,742,500 | 10,837,500 | 10,272,500 | 10,262,500 | 10,262,500 |
| AP | opening balance | | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 |
| Cash | opening balance | | 1,900,000 | 1,900,000 | (1,536,750) | (2,728,750) | (3,115,250) | (4,009,750) | (4,600,250) | 1,900,000 |
| | change in cash | | | (3,436,750) | (1,192,000) | (386,500) | (894,500) | (590,500) | (779,000) | (7,279,250) |
| | closing balance | | | (1,536,750) | (2,728,750) | (3,115,250) | (4,009,750) | (4,600,250) | (5,379,250) | (5,379,250) |

**Professional Fees**

| | Dec | Jan | Feb | Mar | Apr | May | Dec-May Total |
|---|---|---|---|---|---|---|---|
| Katten | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | | 1,250,000 |
| UST | 33,000 | - | | 39,000 | | | 72,000 |
| KCC | 50,000 | 30,000 | 30,000 | 50,000 | 5,000 | | 165,000 |
| Paragon | 30,000 | 30,000 | 30,000 | 30,000 | | | 120,000 |
| Committee | - | 75,000 | 125,000 | 125,000 | 125,000 | | 450,000 |
| Thornton Grout | 25,000 | 25,000 | 10,000 | 10,000 | | | 70,000 |
| FTI | 15,000 | 8,000 | 8,000 | 3,000 | - | | 34,000 |
| Blakes | 6,000 | 10,000 | 5,000 | 4,000 | - | | 25,000 |
| Total | 409,000 | 428,000 | 458,000 | 511,000 | 380,000 | - | 2,186,000 |